UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| LIOSHA WILLIAMS, et al., | § | Civil Action No. 4:23-cv-01025 |
| Plaintiffs | § | |
| | § | |
| | § | |
| v. | § | |
| | § | |
| A.H.D. HOUSTON, INC. d/b/a | § | |
| CENTERFOLDS; W.L. YORK, INC. d/b/a | § | |
| COVER GIRLS; D WG FM, INC. d/b/a | § | |
| SPLENDOR; D TEXAS INVESTMENTS INC / | § | |
| AHD HOUSTON d/b/a TREASURES | § | |
| GENTLEMENS CLUB; ALI DAVARI; | | |
| HASSAN DAVARI, | | |
| Defendants | | |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT**

Plaintiffs oppose Defendants' motion for summary judgment (Dkt. 33) on the grounds set forth below.

**I. Summary of Argument**

Plaintiffs oppose Defendants' motion for summary judgment (Dkt. 33), to the extent it relies on the declaration by Crystal Cowart (Dkt. 33-1). Ms. Cowart's declaration fails to carry the burden under Fed. R. Civ. P. 56 to show an absence of a genuine issue of material fact regarding Plaintiff Williams' hostile work environment claims vs. Treasures, her breach of contact claims vs. Treasures, or her "failure to hire" claims[1] vs. Centerfolds. The failure is because the declarant, Crystal Cowart:

---

[1] The claims are referred to as "failure to hire" by the Court. But in fact, Ms. Williams would not have been "hired" at Centerfolds, had they not discriminated against her; in the same way she was never "hired" at Treasures. Her agreement with Treasures (Dkt. 33-2) provides that she is paid no compensation or benefits, and the only real right it provides her is access to the premises, upon payment of the entry fee (see Facts Section, para. 16, *infra*).

has no personal knowledge of any plaintiff's claims, as she does not claim to have ever met or spoken with any Plaintiff, or observed any of the Plaintiffs at work;

has made a number of false and/or misleading statements in her Declaration (Dkt. 33-1) filed to support summary judgment;

cites provisions of agreements to support her conclusions that there was no discrimination, harassment or forced tipping at Defendants, and those provisions do not do so;

is a long-time employee of Treasures who frequently works to prepare cases with the law firm representing Defendants, and her relationship with lead counsel here is such that about ten years ago, he granted her permission to purport that she worked for his firm – when she did not. **Exhibit G**, Cowart Deposition, p. 10 ll. 7-28; and

alleges Defendants discipline or terminate those found conducting illegal activity on the premises,[2] when there is ample evidence that sex and drug trafficking are tolerated by management.

Defendants Managements' policy of not generally not engaging Black dancers and their policy of discriminating against Black dancers, including by not allowing those they did engage access to Defendant's premises if: (i) other Black dancers were already present; or (ii) if a regional manager was present (where that regional manager had removed a night manager's hiring authority, because the night manager had engaged a Black dancer), is supported by: (a) the deposition[3] of a long-time manager at Defendant Cover Girls, who also worked at Defendant Splendor, and had decades of experience working at those and other adult-entertainment establishments with the same ownership and upper management as Defendants; (b) the declaration of Chanel Nicholson (**Exhibit A**), the named plaintiff in a prior related case, *Nicholson v. AHD Houston Inc. et al.*, Cause No. 4:21-cv-2624, in this District and Division[4]; and (c) the declarations of Plaintiffs Ilori, Declouet, Smith and Castro filed herewith, regarding the discriminatory events

---

[2] Cowart Declaration, Dkt. 33-1 ¶8.

[3] This deposition by A. Skwera, **Exhibit B**, was taken in a prior related case, *Nicholson v. AHD Houston Inc. et al.*, Cause No. 4:21-cv-2624, in this District and Division, filed against three of the four Defendants here, and with the same counsel representing those three defendants as here.

[4] Ms. Nicholson was originally the first-named plaintiff in this case, but her claims were dismissed. *See* Dkt. 31.

surrounding their respective "failure to hire" claims.[5] All the foregoing evidence supports plaintiff Williams' claims for hostile work environment, harassment, discriminatory exclusion, and forced tipping, at Treasures, and her failure to hire claims against Centerfolds (as both Treasures and Centerfolds have the same ownership and management as the other Defendants).

The declaration of Chanel Nicholson (**Exhibit A**), also establishes that there was forced tipping at related establishments with the same ownership and management as Treasures, and thus supports plaintiff Williams' claims for breach of contract against Treasures.

Defendants' position on the other claims by Plaintiff Williams (*i.e.*, Defendants allege there is no standing or ripe controversy for Williams' contract unenforceability claims, and that her hostile work environment claims are time-barred) are addressed in the Argument Section below.

**II. Facts**

1. The Davari brothers (David and George) are, on information and belief, the sole directors and officers of the corporate entity dba Treasures;[6] and it has been established that they are the sole directors and officers of the corporate entities dba Cover Girls, Splendor and Centerfolds.  The Davari brothers are reputedly the owners of all four of these businesses. **Exhibit B** Skwera Deposition, p. 5, l. 8 to p. 6, l. 8; **Exhibit A** Nicholson Declaration ¶¶2; 18; **Exhibits C, D, E, F,** are respectively, Centerfolds, Cover Girls, Splendor and Treasures, Certificates of Incorporation (showing the sole directors and officers of the three corporate entities dba Centerfolds, Cover Girls, and Splendor, are the Davari brothers; Dkt. 33-1, Cowart Declaration, states that she provides services for all four corporate entities).

2. Another figure in the upper management of Cover Girls was Bob Furey, who was regional manager for Treasures, Cover Girls, Splendor, and Centerfolds. **Exhibit G,** Cowart Deposition, p. 17 l. 22 to p. 18 l. 2. Bob Furey was also Director of Operations at Gold Cup, which had been another adult entertainment establishment owned by the Davari brothers, which closed in 2015.

---

[5] The declarations by these four plaintiffs conclusively establish all elements of a *prima facie* case of discrimination against each of them; forcing the conclusion that summary judgment against them should be denied.

[6] "Treasures" is Defendant AHD HOUSTON d/b/a TREASURES GENTLEMENS CLUB. The other corporate Defendants, *i.e.,* Centerfolds, Splendor, and Cover Girls in the Table, are similarly the dba names for these Defendants. The Defendants' dba names only are used throughout this document.

**Exhibit B** Skwera Deposition, p. 17, l. 24 to p. 18 l. 7; p. 6, l. 25 to p. 7, l. 5. He was frequently present at Splendor as well (**Exhibit A**, Nicholson Declaration ¶2).

3. Management at Centerfolds, Treasures, Cover Girls and Splendor was fully overlapping. Bob Furey and Jere Gibbons are indicated as being the Managers at all three establishments, and the contacts for dancers, if "[Y]ou are the victim of trafficking or human trafficking…" in Ms. Williams agreement with Treasures (Dkt. 33-2, p. 13, top); and in the agreements of Ms. Nicholson with Splendor and Cover Girls. **Exhibit 1** (p.11-12); **Exhibit 2** (p.11) to **Exhibit A**. Jere Gibbons is related to David Davari. **Exhibit B** Skwera Deposition, p. 15 ll. 20-25. Crystal Cowart stated that Bob Furey is regional manager covering Centerfolds, Treasures, Cover Girls and Splendor. **Exhibit G**, Cowart Deposition, p. 17 ll. 22 to p. 18 l. 4.

4. Jere Gibbons had been at Gold Cup since about 2000 (Skwera Deposition, p. 27, l. 1-8 – 22; p. 31, ll. 4-5) and was present at Cover Girls as well. **Exhibit B** Skwera Deposition, p. 17 ll. 8-10. Hal Naumann was General Manager at Cover Girls (**Exhibit B** Skwera Deposition p. 40, l. 15 to p. 41, l. 1) was also a manager at Gold Cup for at least several years. **Exhibit B** Skwera Deposition p. 27, ll. 21-22. Jere Gibbons and Hal Naumann frequently communicated during their tenure at Cover Girls, and at Gold Cup. **Exhibit B** Skwera Deposition. 17, ll. 8-22. Bob Furey also frequently communicated with Hal Naumann at Cover Girls, **Exhibit B** Skwera Deposition p. 45, ll. 7-9. Andy Skwera was a long-term manager of Davari owned entertainment establishments (**Exhibit B** Skwera Deposition p. 5, l. 8 to p. 8, l. 1). He started as early as 1996 and continued with one interruption of less than two year (p. 31 l. 1-24). He was a manager at night at Cover Girls until about 2020. **Exhibit B** Skwera Deposition p. 53, l. 24 to p. 54, l. 1; p. 10, l. 13-17. Mr. Skwera reported to both Hal Naumann and Bob Furey at Cover Girls. **Exhibit B** Skwera Deposition p. 47, ll. 21-21.

5. Declarant Chanel Nicholson worked for extended periods at Splendor, Centerfolds and Cover Girls. **Exbibit A.** On multiple occasions at each establishment, she would arrive for work and be told that she could not enter because other Black dancer(s) were already there. (**Exhibit A** Nicholson Declaration ¶¶7, 20). Managers at Splendor and Centerfolds would, on her request, confirm that denial of entry because there were already "too many" Black dancers on the premises. **Exhibit A** Nicholson Declaration ¶¶7.

4

6. Defendants have a reputation for not providing dancer positions to Black women. **Exhibit B**, Skwera Deposition, p. 41, l. 21 to p. 43, l. 18. Qualified Black dancers were rejected at Cover Girls and Gold Cup. **Exhibit B**, Skwera Deposition, p. 50 ll. 4-18. At Cover Girls, Hal Naumann (General Manager), didn't like to hire dark skinned women. **Exhibit B**, Skwera Deposition, p. 41, ll. 18-21. At least twice, on being asked by the hostess about retaining a dancer candidate, Hal Naumann determined that she was Black from the hostess, and then instructed the hostess not to offer her a position. **Exhibit B**, Skwera Deposition, p. 148 ll. 2-23.

7. At Cover Girls, on one occasion, Bob Furey asked "who hired her" referring to a Black dancer, said there's "too many black girls," and removed Mr. Skwera's hiring authority after it was determined that Mr. Skwera was responsible. **Exhibit B**, Skwera Deposition, p. 44, ll. 13-20; p. 49, ll. 8-11; p. 78 l. 20 to p. 79. l. 8. Mr. Skwera justified his actions to Mr. Furey, stating that the Black dancer in question was "good looking." **Exhibit B**, Skwera Deposition, p. 79, ll. 7-8.

8. At Splendor and Cover Girls, Ms. Nicholson would sometimes be refused access because Bob Furey was already there (**Exhibit A** Plaintiff's Declaration ¶¶7; 20).

9. Mr. Skwera stated that Hal Naumann's preferred Caucasian dancers to such an extent he would hire unattractive ones, hurt business and cause customer complaints.  **Exhibit B**, Skwera Deposition, p. 45 ll. 10 to p. 46, l. 5. 20.

10. At Cover Girls, a wide variety of illegal activity on the premises was reported to management by Mr. Skwera, but the illegal activity was allowed to continue. Mr. Skwera reported drug sales on the premises to Hal Naumann and Bob Furey (**Exhibit B**, Skwera Deposition, p. 47, ll. 12-23) and reported underage drinking to them (**Exhibit B**, Skwera Deposition, p. 47, l. 24 to p. 48, l. 12), but they took no action.  Ms. Nicholson also states that a number of dealers, employees, dancers and managers were selling illegal drugs to dancers at Cover Girls, and illegal drugs, condoms and non-prescription Viagra to customers. **Exhibit A**, Nicholson Declaration ¶24.

11. Ms. Nicholson states that notorious pimps were often on the Cover Girls premises. **Exhibit A**, Nicholson Declaration ¶23. Other Davari clubs had similar tolerance for sex-trafficking activity. When Mr. Skwera reported to Bob Furey and Hal Naumann that a known pimp was on the premises at Gold Cup, the pimp was allowed to remain. **Exhibit B**, Skwera Deposition, p. 150, l. 23 to p. 151, l. 23. Pimps were also allowed to operate at Splendor so freely that Plaintiff once saw a pimp

allowed to enter and beat a dancer (who was his sex-slave) in full view. **Exhibit A**, Nicholson Declaration ¶¶ 11-12.

12. Ms. Nicholson states that the manager "Joey" at Splendor once explained to her that it was the policy of the Davari brothers and upper management to limit the number of Black dancers on the premises at any one time. Joey added that Bob Furey and he both followed the policy because they believed Black dancers would attract more police attention to the business, and they believed that might reduce his income, because: it was income from giving pimps access to the premises, and from sales of illegal drugs on the premises. **Exhibit A**, Nicholson Declaration ¶10. Limiting the number of Black dancers actually reduced the establishment's revenue (**Exhibit B**, Skwera Deposition, p. 9, ll. 21-24) and damaged business by elevating unprofessional Caucasian women to dancer positions. **Exhibit B**, Skwera Deposition, p. 45, ll. 10-20.

13. The declarant relied on to support Defendants' motion for summary judgment (Dkt. 33), Crystal Cowart, is a long-time employee of Treasures. **Exhibit G**, Cowart Deposition, p. 8 ll. 10-19.  The declarant has worked for over a decade in preparing cases with the lead counsel representing Defendants. **Exhibit G**, Cowart Deposition, p. 10 ll. 7-10; p. 11 ll. 7-10. About ten years ago, lead counsel for Defendants granted her permission to purport that she worked for his firm – when she did not. **Exhibit G**, Cowart Deposition, p. 10 ll. 7-28.

14. Crystal Cowart's declaration, Dkt. 33-1, relies on the "anti-harassment provision" in Ms. Williams' agreement (Dkt. 33-2, p. 10¶8) to support Ms. Cowart's conclusion that there was no race-based discrimination by Defendants against any Plaintiffs. But this provision does not prohibit discrimination in hiring by management. It only prohibits harassment by the contracting party, *i.e.,* Ms. Williams, and further provides that she is to report harassment to management. There is no provision in Ms. Williams' agreement (Dkt. 33-2) allowing her to prevent her race-based exclusion from the premises,[7] or even to report it. Accordingly, the statement in Ms. Cowart's declaration, Dkt. 33-1¶5, that Ms. Williams' agreement (Dkt. 33-2, p. 10¶8) prohibits "harassment **or discrimination** based on race" is false.

15. Crystal Cowart's declaration, Dkt. 33-1¶6, provides that Defendants have never "adopted, condoned, or permitted any sort of racially discriminatory policy or practice…" She does not

---

[7] She alleges such race-based exclusion took place, Dkt.23, Amended Complaint ¶¶10, 11.

mention existence of any written anti-discrimination policy by Defendants (other than anti-harassment, as in ¶14, *supra*).

16. Crystal Cowart's declaration, Dkt. 33-1¶7, states that Defendants do not require "an African American dancer to pay in order to receive access to the club **other than standard fees that are applicable to all dancers.**" (emphasis added) Ms. Williams' agreement (Dkt. 33-2, p. 1¶3) provides that she has the "ability to arrive and leave the premises at any time without penalty," meaning, there should not be *any* entry fees. Thus, Ms. Cowart admits to breaches of Ms. Williams' agreement, in that such entry fees were applied to Ms. Williams.

17. Ms. Nicholson states that she would often be refused access to work at Splendor and Centerfolds, unless she paid certain managers additional requested monies, and that she was also usually forced to tip managers and other employees, or face being denied future access. **Exhibit A**, Nicholson Declaration ¶3-4. She once, at Splendor, had to pay $1500 for access. **Exhibit A**, Nicholson Declaration ¶5. Similarly, at Cover Girls she was often forced to tip managers and other employees at the end of her shift, or face being denied future access. At Cover Girls, she was once excluded until she paid a manager a "fine." **Exhibit A**, Nicholson Declaration ¶19.

18. Plaintiff Declouet's declaration (**Exhibit H)** supports her failure to hire claims against Centerfolds: that they refused her a dancer position and told her that Centerfolds had a limit on how many black women they could hire, and they were "all full." Plaintiff Ilori's declaration (**Exhibit I**) supports her failure to hire claims against Splendor: that they refused her a dancer position and told her that they had enough ebony dancers. Plaintiff Ilori's declaration (**Exhibit I**) supports her failure to hire claims against Centerfolds: that they refused her a dancer position and she was told that that they only grant dancer positions to a limited number of Black dancers. Plaintiff Smith's declaration (**Exhibit J**) supports her failure to hire claims against Treasures: that when she went there, a manager said there were "too many Black girls" on day shift and to come for night shift if she wanted to work there. Plaintiff Castro's declaration (**Exhibit K**) supports her failure to hire claims against Splendor and Cover Girls: that she was told that because she was not white, they wouldn't hire her.

### III. Argument

**A. There Was a Hostile Work Environment at Treasures; Summary Judgment Against Ms. Williams Is Precluded**

Crystal Cowart does not claim to have personal knowledge of incidents surrounding the claims of Ms. Williams or any other plaintiff. She is a long-time employee of Treasures who has worked for over a decade to prepare cases with the lead counsel representing Defendants. **Facts** ¶13. At one point, Ms. Cowart was permitted by lead counsel to falsely purport that she worked for him; indicating a very close relationship. **Facts** ¶13. The statement in Ms. Cowart's declaration, Dkt. 33-1¶5, that Ms. Williams' agreement (Dkt. 33-2, p. 10¶8) prohibits "harassment **or discrimination** based on race" is false. **Facts** ¶14. Ms. Williams' agreement merely prohibits her from harassing others, and does not mention racial discrimination at all. Defendants apparently have no written anti-discrimination policy. **Facts** ¶15. Accordingly, Ms. Cowart's declaration, Dkt. 33-1, fails to "demonstrate the absence of a genuine issue of material fact …" and as Defendants have failed to meet this initial burden, their motion must be denied. *See Little v. Liquid Air Corp.*, 37 F.3d 1069, 1074 (5th Cir. 1994).

But however the burden-shifting under the applicable law is construed in this case, the evidence establishes that there was an active practice and policy of racial discrimination by all Defendants. The regional manager (Bob Furey) responsible for Treasures and all other Defendants (**Facts** ¶2), had removed all hiring authority from a manager under him, because the latter manager had once allowed a Black dancer to work at Cover Girls. **Facts** ¶7. The General Manager at Cover Girls (Hal Naumann) had on two occasions refused to meet Black applicants for dancer positions, upon learning they were Black. **Facts** ¶6. Bob Furey frequently communicated with Hal Naumann. **Facts** ¶4. All the Defendants had a reputation for not granting dancer positions to Black applicants. **Facts** ¶6; 1. And, all the Defendants (as they are all owned by the Davaris, **Facts** ¶1) had a policy of not granting dancer positions to Black applicants. **Facts** ¶12. The policy was reportedly for the purpose to not attract police attention to sex and drug trafficking at Defendants' premises, which management profited from. **Facts** ¶12.

In addition, Ms. Nicholson, who worked for extended periods at Centerfolds, Splendor and Cover Girls, was denied access for work multiple times, because there were already other Black dancers on the premises; or, at Splendor and Cover Girls, because Bob Furey was there. **Facts**

¶¶5&8. Similarly, four of the five plaintiffs have submitted evidence of "refusal to hire" at Treasures and at other Defendants, for discriminatory reasons. **Facts** ¶18.  There was the same ownership and management at Treasures as at Centerfolds, Splendor and Cover Girl, where race-based denial of access was a common practice.

Accordingly, there is a genuine issue of fact on Williams' hostile work place claims at Treasures, and Defendants' motion for summary judgment on these claims should be denied.

**B. Ms. Williams Was Required to Tip Managers in Breach of her Agreement**

The Cowart Declaration, Dkt. 33-1¶9, states: "Pursuant to the 'Policies Regarding Dancer Conduct' incorporated in [Ms. Williams' agreement, Dkt. 33-2], dancers are not required or forced to tip managers, waitresses, bus boys, DJs, valets, or any other individual affiliated with Centerfolds, Splendor, Treasures Gentlemen's Club, or Cover Girls." The applicable portion of Ms. Williams' agreement, Dkt. 33-2, ¶19, does not prohibit managers from requiring tips for her access, as she alleges took place. This portion of her agreement merely provides there is no mandatory tip sharing policy, as follows: "There is no mandatory tip sharing arrangement among management, dancers, and employees. If you choose to voluntarily tip any manager, dancer, waitress, bus boy, DJ, valet, or any other individual affiliated with Treasures, you do so at your sole discretion." Ms. Cowart is again shown to not be credible, and her declaration again fails to demonstrate the absence of a genuine issue of material fact. As Defendants have failed to meet this initial burden, their motion must be denied regarding Ms. Williams' forced tipping (breach of contract) claims. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1074 (5th Cir. 1994).

Moreover, Plaintiff Williams has introduced evidence of forced tipping at other Davari clubs (which all have the same ownership and upper management as Treasures, **Facts** ¶1&2). The Declaration of Chanel Nicholson, **Exhibit A**, establishes that there was forced tipping at Centerfolds, Splendor and Cover Girls. **Facts** ¶9. Because the other Defendants all have the same ownership and upper management as Treasures, this is sufficient evidence to create an issue of fact regarding forced tipping. Further, Ms. Cowart has admitted to an additional breach of Plaintiff Williams' Agreement, noting that she was required to pay an entry fee, though the Williams' Agreement specifies that she can "arrive and leave the premises at any time without penalty." **Facts** ¶16. Thus, there is a genuine issue of material fact regarding her breach of contract claims against Treasures, and Defendants' motion for summary judgment on these claims should be denied.

**C. The Unconscionability of Ms. Williams' Agreement is Ripe for Review**

Defendants Ms. Williams' declaratory relief request, that her agreement be declared unconscionable, "presents no ripe case or controversy."" This declaratory relief requested is pertinent to Defendants' Affirmative Defense (Dkt. 32) at para. 111, which states:

> Defendants assert that Plaintiffs are not entitled to pursue a class action or any other aggregate form of litigation against Defendants because any and all putative class members have executed binding agreements with Defendants that contain arbitration agreements and/or class action waivers. Accordingly, Plaintiffs lack standing, capacity, and/or authority to bring, participate in, or maintain a class action, or represent the interests of others against Defendants **in any aggregate proceeding**.[emphasis added]

There is therefore a "case or controversy" here because this action is an "aggregate proceeding" with several plaintiffs. *See Riley v. Hous. Nw. Operating Co.*, No. H-19-2496*9 (S.D. Tex. 2020) ("And a party to a contract generally has Article III standing to bring claims for declaratory relief related to that contract. *BroadStar Wind Systems Group Limited Liability Co. v. Stephens*, 459 F. App'x 351, 356 (5th Cir. 2012)"); *TNT Crane & Rigging Inc. v. Atkinson*, No. 2:14-cv-265 *4 (S.D. Tex. 2015): (The enforceability of a non-compete agreement in a breach of contract case provides standing such that it was held properly asserted in a motion for summary judgment, because "the issue is presented for a clear and proper purpose in this case—to defeat the claim for breach of contract."). *See Meyer v. T–Mobile USA Inc.*, 836 F.Supp.2d 994, 1003 (E.D. Cal. 2011) (An imminent threat of future harm is sufficient to confer standing, citing *Lee v. Am. Express Travel Related Servs., Inc*., 348 Fed. Appx. 205, 207 (9th Cir. 2009)).

**D. Under the Continuing Violations Doctrine, Ms. Williams' Hostile Work Environment Claims Are Not Time-Barred**

Defendants claim that Williams' claims are "likely barred by the statute of limitations" because: "Williams began working for Treasures on May 16, 2018 and this lawsuit was not filed until March 21, 2023 – four years and 10 months after she began working and the alleged breaches would have begun occurring." However, Williams Section 1981 claims for hostile work environment are not time-barred. *See e.g., Miranda v. Lumpkin*, Civil Action 2:21-CV-00271*5 (S.D. Tex. Oct 28, 2022) ("Claims alleging discrete acts are not subject to the continuing violation doctrine. *Heath v. Board of Supervisors for Southern University and Agricultural and Mechanical College*, 850 F.3d 731, 737 (5th Cir. 2017). Conversely, hostile environment claims are subject this doctrine because they involve repeated conduct, which means that the 'unlawful employment

practice' cannot be said to occur on any particular day.'" Citing  *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 115-17 (2002)).

### E. Williams' Failure-to-Hire Claim Against Centerfolds

Support for Ms. Williams' § 1981 failure-to-hire claim against Centerfolds, includes  the descriptions and examples of discrimination, and the support of it by upper management as set forth in **Exhibit A**, Nicholson Declaration (see **Facts** ¶¶5, 11&12); the examples of Defendants' management discriminatory actions and Defendants' racist reputation as described by long-term manager Andrew Skwera (see **Facts** ¶¶4, 6-12); the description of discriminatory actions by other Plaintiffs of discrimination against them by other Defendants **Exhibits H to K**), and especially the declarations by Plaintiffs Declouet and Ilori (**Exhibits H & I**), who also, like Ms. Williams, state that Centerfolds discriminated against them. Because the other Defendants all have the same ownership and upper management as Centerfolds, these collective sworn statements (**Exhibits H to K**), demonstrate that there is a genuine issue of material fact regarding Ms. Williams' failure to hire claims.

### F. Other Plaintiff's Failure-to-Hire Claims Are Independently Supported

Defendants' Motion to Dismiss Plaintiffs Declouet, Ilori, Smith, and Castros' § 1981 claims fails on the merits because of the declarations by those plaintiffs filed herewith. (**Exhibits H to K**). Plaintiff's declarations meet all parts of the four-part test that the Court in *McDonnell Douglas Corporation v. Green,* 411 U.S. 792, 802-*04 (1973)* stated was sufficient to show violation of Section 1981 -- even though, it should be noted, satisfaction of the four-part test is not required to prevail on summary judgment. *See Wesley v. Gen. Drivers*, 660 F.3d 211, 213 (5th Cir. 2011) ("The Supreme Court also noted, however, that cases of racial discrimination are fact-specific, stating that the *McDonnell Douglas* four-part test would not necessarily be applicable to all fact situations. 411 U.S. at 802 n. 13, 93 S.Ct. 1817."). There is a genuine issue of material fact with respect to these and all the remaining claims of all parties. Summary judgment should be denied in all respects.

### VIII. Conclusion

Defendants' motion for summary judgment should be denied in all respects.

Respectfully Submitted,


By: /s/*Eric P. Mirabel*
    Eric P. Mirabel
    Texas State Bar No. 14199560
    Southern District ID No. 9708
    eric@emirabel.com
    3783 Darcus St.
    Houston, Texas 77005
    Tel:  281 772-3794
    Fax: 713 667 4234
    **ATTORNEY FOR PLAINTIFFS**


CERTIFICATE OF SERVICE

On this 31st day of May, 2024, I hereby certify that a true and correct copy of the foregoing document was served on opposing counsel via the Clerk of the Court through the ECF system.