IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CHANEL E.M. NICHOLSON, et al. | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | |
| | § | |
| A.H.D. HOUSTON, INC. d/b/a | § | CIVIL ACTION NO. 4:23-cv-01025 |
| CENTERFOLDS; W.L. YORK, INC. | § | |
| d/b/a THE COVER GIRLS; D WG FM, | § | |
| INC d/b/a SPLENDOR, D. TEXAS | § | |
| INVESTMENTS INC / AHD HOUSTON | § | |
| d/b/a TREASURES GENTLEMENS | § | |
| CLUB; | § | |
| | § | |
| *Defendants.* | § | |

**Response to Defendants' Motion For Protective Order
and Supplement Thereto**

**1. Defendants' Motion for Protective Order and the Supplement Are Baseless and Meritless**

Defendants filed a motion for protective order (Dkt. 68) on December 6, 2024 and a Supplement to that motion (Dkt. 69) on December 12, 2024. Defendants' motion for protective order (Dkt. 68) rests on unsworn, undated text messages to opposing counsel by Chanel Nicholson, who Defendants' own filings in this Court (in a prior case) show by clear and convincing evidence is a perjurer and a prostitute. Defendants' motion for protective order (Dkt. 68) also references a declaration (Dkt. 68-2) by opposing counsel Ben Allen about a conversation with Ms. Nicholson, where the only thing she said that is possibly supportive of their protective order, is an allegation by her that the undersigned told her to disobey a subpoena to appear "prior to the previous November trial setting." She admitted to Mr. Allen that the undersigned had sent her a written message to comply with the subpoena.[1]

---

[1] An email on Aug 11, 2024 (**Exhibit E**) from the undersigned to her, states exactly that.

1

Based on Ms. Nicholson's unsworn text messages and an allegation that at some point in the past the undersigned had told her to disobey a subpoena (though he stated the exact opposite in writing), Defendants ask that the "Court dismiss this case in its entirety and … sanction counsel for his conduct, requiring him to pay for all costs and attorneys' fees associated with bringing this Motion."

In their Supplement to that motion (Dkt. 69), Defendants claim that their call for dismissal of the action is further supported, because in a more recent series of text exchanges, the undersigned called Ms. Nicholson (who had been previously subpoenaed by them) "a liar," Mr. Wallace's "hoe," and a "stupid evil c***." Defendants fail to note in their Supplement (Dkt. 69) that opposing counsel Wallace and Ms. Nicholson were collaborating to bring a malpractice case against the undersigned, where Mr. Wallace would serve as an attorney witness. He also failed to note that Ms. Nicholson's counsel, following sending notice to the undersigned that he would file a malpractice claim against him, sent another email that she was preparing a grievance with the state bar "that she has filed or is filing against you." Defendants also fail to note in the Supplement that Ms. Nicholson called the undersigned then texted him several times and invited him to contact her. And after his initial questions to her, she goaded him to continue to comment. By using language as he did, the undersigned prompted Ms. Nicholson to ultimately reveal the complete lack of truth in the allegations she apparently intended to include in her grievance against him.

Moreover, Chanel Nicholson's first contact with opposing counsel, in May 2024, was an offer by her to provide her testimony for Defendants in this case *quid pro quo*. Further, she had a financial interest in damaging the undersigned's reputation, known to opposing counsel from their collaboration to bring a malpractice case against the undersigned. And yet further, opposing counsel collaborated with Ms. Nicholson in an apparent extortion attempt against the undersigned. Defendants produced, as a Bates labeled document in this case, an embarrassing video that the undersigned had provided to Ms. Nicholson at an earlier time. Defendants produced this video from her two days after the undersigned told her attorney that he would not pay her any consulting fees.

Finally, Defendants did not have any conference with Plaintiffs' counsel, and merely stated in an email they were filing a motion for protective order, leaving the undersigned to guess that it

must relate to allegations by Chanel Nicholson; without knowing what the allegations were. Defendants' actions were in complete disregard of the Court's Procedures B.5(C) for conferencing.

**2. Prior Proceedings and Filings**

The undersigned met Ms. Nicholson in a karaoke bar in about April 2021 and they began a relationship. On August 12, 2021 the undersigned filed on her behalf in this Court, Nicholson v. AHD Houston, Inc. et al. (assigned Civil Action No. 4:21-CV-2624) as a class action for discrimination (hereinafter, the "Prior Case"). The initial defendants included three of the four Defendants who are also defendants herein; *i.e.*, the corporations dba Centerfolds, Cover Girls and Splendor.

Defendants' motion for summary judgment in the Prior Case for Plaintiff's claims against the then two remaining defendants,[2] Cover Girls and Splendor, was granted on 5.24.2023. This Court issued a final order and judgment on 6.19.2023 in the Prior Case, refusing to grant Appellant's motion under Fed. R. Civ. P. 59 to amend or alter the summary judgment entered in favor of defendants.

The Prior Case was then appealed to the Fifth Circuit, which affirmed the district court's decision on 3.4.2024. Ms. Nicholson filed a *pro se* petition for a writ of certiorari and motion for leave to proceed in *forma pauperis* on 5.10.2024. The Supreme Court petition is pending.

Before defendants' motion for summary judgment in the Prior Case was granted, the undersigned filed the present action on 3.22.2023, on behalf of Ms. Nicholson and seven other plaintiffs. Claims of one of the plaintiffs, Joeanne Colmes, were voluntarily dismissed on 7.31.2023 (Dkt. 24), and Ms. Nicholson's claims were dismissed based on *res judicata* from the Prior Case on 3.15.2024. Former plaintiff Tabitha Vanns' claims were also dismissed on 3.15.2024.

The only subpoena by Defendants for Ms. Nicholson ever issued in this case was, on information and belief, in early August 2024, before the first scheduled trial date on August 20, 2024. Defendants' counsel began actively collaborating with her, offering her his services as a witness for her malpractice case against the undersigned, before the next scheduled trial date on

---

[2] Claims against other initial defendants, including Centerfolds, had been dismissed earlier.

November 18, 2024. Plaintiffs' motion for continuance was granted on November 13, 2024 (Dkt. 62) resetting the trial for February 10, 2025.

After Defendants filed their motion for protective order (Dkt. 68) on December 6, 2024, the undersigned served them an unfiled motion for sanctions for their filing it, pursuant to the procedures for filing a sanctions motion under Fed. R. Civ. P. 11. Plaintiffs' motion for sanctions included most of the exhibits filed with this response. Among these exhibits, discussed below, are Defendants' filings in the Prior Case that show by clear and convincing evidence that Ms. Nicholson committed perjury in the Prior Case, to try to avoid a statute of limitations bar. Plaintiffs' unfiled motion for sanctions also showed that she had been terminated for prostitution at Defendant Cover Girls before the statutory bar date. Plaintiffs' unfiled motion for sanctions also showed texts from Ms. Nicholson offering prostitution services to the undersigned, during the course of his prior representation of her, and other texts showing that all sexual encounters with the undersigned were in the course of a relationship where the undersigned supported her financially – in direct contrast to her allegations of coerced "bathing" and "showering" encounters set forth in her texts (Dkts. 68-3; 68-4; 68-5) alleged to support Defendants' motion (Dkt. 68).

**3. Ms. Nicholson's Demands for Payment, Offers for "Cooperative" Testimony, and Defendants' Evidence That She Is a Perjuring Prostitute**

For a period after early March, 2024, the undersigned could not contact Plaintiff Liosha Williams. In May 2024, he asked for Ms. Nicholson's help in reaching Ms. Williams. Ms. Nicholson demanded payment to do so. *See* **Exhibits A, B, C**.[3] The undersigned offered to pay her some consulting fees, after settlement or receipt of funds. She demanded one-half of the settlement. *See* **Exhibit B**.

Some time later, on May 21, 2024, Ms. Nicholson became enraged during a text exchange about lack of immediate payment of funds by the undersigned. She threatened to contact opposing counsel Casey Wallace, and provide him some unspecified information, harmful to the undersigned

---

[3] The precise dates of these exhibits are unknown, as these exhibits are photos of the undersigned's phone made by a third party. The texts themselves were deleted. The events described in these texts mention an apartment leasing dispute in early December, 2023, that Ms. Nicholson sought the undersigned's *pro bono* help with.

or the present case. Mr. Wallace checked with the undersigned before accepting her calls or speaking with her. See **Exhibit D**.

In a later communication about her interactions with Mr. Wallace, Ms. Nicholson stated that she had proposed a *quid pro quo* arrangement with him for her testimony. *See* **Exhibit E** emails, last page. The emails in **Exhibit E** were sent before the first scheduled trial date, August 19, 2024. Ms. Nicholson again confirmed that she proposed a *quid pro quo* arrangement with Mr. Wallace for her testimony in texts with Plaintiff Destiny Ilori. *See* **Exhibit E1** (Ms. Nicholson states that she told opposing counsel: "I will be cooperative if we come to an agreement about my case"). She also stated in a text with the undersigned that opposing counsel had offered to pay her to "sabotage" this case. **Exhibit E3**.

Some of the highlighted parts of the emails in **Exhibit E** show that the undersigned instructed Ms. Nicholson to obey any subpoena from Defendants. While the Declaration of Mr. Allen (Dkt. 68-2) alleges that Ms. Nicholson has a recording of a phone call where the undersigned instructed her not to obey a subpoena, no recording was produced, and more tellingly, Mr. Allen does not even claim to have heard the recording.

Some time after sending the emails in **Exhibit E** (see highlighted comments in green, *e.g.* "NEVER EVER do anything to hurt you" on page 3), Ms. Nicholson decided to try to bring a malpractice lawsuit against the undersigned.[4] She indicated that opposing counsel Casey Wallace agreed to be her witness in such action, at a meeting with the undersigned on November 22, 2024. The following Monday, November 25, 2024, the undersigned received an email from attorney Lee Giddens, **Exhibit F**, stating that he had "[B]een retained by Chanel Nicholson to represent her for what she considers to be legal malpractice, in addition to other unprofessional actions that she considers to be offensive." The undersigned called him and inquired why she was bringing a malpractice claim while her Supreme Court case was still pending. Mr. Giddens replied that he knew of the Supreme Court case, but he had an attorney witness, and he brought malpractice cases when he had an attorney as a witness. The undersigned told Mr. Giddens that he would not pay

---

[4] The earliest indication that Ms. Nicholson was bringing a malpractice lawsuit was in her November 3, 2024 text to Plaintiff Destiny Ilori, **Exhibit E2.**

Ms. Nicholson any consulting fees as she was bringing a malpractice action. Mr. Giddens said he would relay the message to his client.

Later that day, the undersigned sent Mr. Giddens an email (**Exhibit G**) with attachments, **Exhibits H, I** and **J**. The email, **Exhibit G,** summarizes defendants' allegations in **Exhibit H,** a response to plaintiff's summary judgment motion in the Prior Case, filed by Defendants' counsel herein (note that the signature block in **Exhibit H** shows that Mr. Wallace was lead attorney). **Exhibit G** discusses that Defendants' response to plaintiff's summary judgment motion provided clear and convincing evidence, in the form of a declaration by Defendants' administrator, Ms. Cowart, that Ms. Nicholson only worked at Cover Girls for five days in 2016. Ms. Nicholson had to have worked at Cover Girls after August 12, 2017 to avoid a statute of limitations bar to her Section 1981discrimination claims. Ms. Nicholson's declaration to support summary judgment stated that she worked at Cover Girls "up to six shifts per week" until late 2017. **Exhibit K ¶**17.

Ms. Cowart's declaration, **Exhibit I,** shows Ms. Nicholson's declaration is perjurious. Ms. Cowart's declaration, **Exhibit I**, is based on Cover Girls' electronic records of dancer's entries, exits, house fees paid and "dance dollars" (for credit card charges) cashed out. The electronic records show that Ms. Nicholson worked five times at Cover Girls in November 2016, and not at all in 2017. The electronic records also show that she had $200 in credit card payments at Cover Girls that she cashed out early morning November 19, 2016. There were no electronic records of her entry, exit, house fees paid or "dance dollars" anytime after that, or anytime in 2017.

Furthermore, Ms. Cowart's deposition (taken in this case), shows that she worked for Defendants in administration for the past 10 years, and has helped opposing counsel in a number of cases. *See* **Exhibit L,** highlighted deposition portions, first three pages. The last three pages in **Exhibit L (**highlighted portions), show that Ms. Nicholson was terminated at Cover Girls for prostitution. **Exhibit J** is the document Defendants produced after the deposition (*see* **Exhibit L,** last page, ll. 13-14) to support Ms. Cowart's assertion that Ms. Nicholson was terminated for prostitution. The $200 in credit card payments at Cover Girls that Ms. Nicholson cashed out early morning November 19, 2016 were presumably for the prostitution services, as they are the last record of any earnings or attendance by her there.

**4. Extortion, Growing Greed and Thwarted Legal Claims Failing to Satisfy It; Sex and Love**

Turning back to more recent events, on Wednesday, November 27, 2024, the day before Thanksgiving, Defendants produced a Bates numbered video of the undersigned in shorts, no shirt, reciting verse. This video had been sent to Ms. Nicholson by the undersigned at some point in the past. Presumably, she provided it to Mr. Wallace [5] after the undersigned's conversation on November 25th with her lawyer, Mr. Giddens, where the undersigned stated he would not be paying her any consulting fees. It was clearly intended as extortion-type warning: Ms. Nicholson could and would produce embarrassing materials if not fully paid in compliance with all her demands.

After Thanksgiving, the undersigned turned back to the malpractice issues that might be alleged against him. In dismissing her claims against Splendor on summary judgment as barred by the statute of limitations in the Prior Case, the Court had noted that she had failed to assert hostile work environment claims against Splendor. *See Nicholson v. W.L. York, Inc*., Civil Action 4:21-cv-2624 *9 (S.D. Tex. May 24, 2023) (The Court noting that the continuing violations doctrine only applies to hostile work environment claims). The undersigned sent Mr. Giddens **Exhibit M** the morning of December 2nd, noting, *inter alia*, that based on the operative complaint (and including the statements in her declaration, **Exhibit K** ¶14) she had lacked any basis for claiming "hostile work environment" at Splendor; and thus, dismissal could not have been avoided by artful claiming of hostile work environment to overcome the statutory bar.

That afternoon, the undersigned received a violently angry text message from Ms. Nicholson, **Exhibit N**, accusing him repeatedly of lying, lying to her lawyer; and, without recognizing the irony, stating: "Now all of a sudden your (*sic*.) saying what the defendants were saying." An additional text stated that Mr. Wallace ("Casey"), "[I]s letting my lawyer know what's really going on." **Exhibit N**, p. 2.[6]

---

[5] Mr. Wallace refused to identify the date he received it, when requested to do so.

[6] I speculate that Ms. Nicholson's extreme anger was because Mr. Giddens conveyed to her that day that he was not going to file a malpractice case against the undersigned (as **Exhibits G** to **M** sent to him showed him that there was no case, and that there was no credible attorney witness for such case). That speculation is consistent with the fact that no such case has yet been filed, although Mr. Giddens stated in their call on November 25th that he was *not* going to wait for the Supreme Court to resolve Ms. Nicholson's claims there before filing. That speculation is also consistent with Mr. Giddens' statement in an email on December 6, 2024 that: "We are actually waiting for the state bar to respond to the grievance that she has filed or is filing against you." **Exhibit U.**

It is significant how Ms. Nicholson's claims of sexual misconduct had evolved to those on December 2, 2024, shown in **Exhibit N**, from those in her texts that Defendants rely on in their motion.[7] In Dkt. 68-4 she claims the undersigned "would have me come over and shower with him" (p. 1), and "he made me feel like if I don't obey and be GRATEFUL, then he will put certain things in the case to make it look crazy…" (p. 2). Dkt. 68-4 continues, Ms. Nicholson stating the undersigned "got mad at me for not coming to take a bath with him so he did whatever he wanted to do with the amendment complaint and everything thing (sic.) else if I didn't cooperate, he would pop up at my apartment at times." (p. 4)

Similarly, Mr. Allen's declaration (Dkt. 68-2) states that Ms. Nicholson said: "Mr. Mirabel had threaten [sic.] to stop representing Plaintiffs in this matter if they did not 'pay couch fees.'" Thus, she apparently did not say in his conversation that the undersigned had demanded "couch fees" from her.

In **Exhibit N**, page 1, in contrast, her updated allegations are: "You used my case against me for sexual gain … " and that her new lawyer "never tried to invite me over to lure me into have sex like you did." Continuing, **Exhibit N,** p. 2, she declares that the undersigned was charging "couch fees" for the first time: "Why were you using my case as a meal ticket to my body for years." Finally, she alleges rape, claiming self-loathing for "you forcing me to having sex with you." **Exhibit N,** p. 2.

Ms. Nicholson, however, sent texts to the undersigned that conclusively disprove every one of her allegations of sexual misconduct. The undersigned never used "her case" to extract sexual favors, as proven by her text from about December 2023[8] (**Exhibit O**), where she states that the undersigned had sex with her "MULTIPLE TIMES" and "GAVE ME LARGE AMOINTS (sic.) OF MONEY…" **Exhibit P**, also from late 2023, contains a solicitation for prostitution, consistent

---

[7] The texts "supporting" Defendants' motion, Dkt. 68-3, 68-4 and 68-5, are undated, further demonstrating their lack of reliability as the basis for a motion in this Court. But because there is no mention of malpractice or Mr. Giddens, they were presumably received by opposing counsel before December 2, 2024, when the Ms. Nicholson sent the texts in **Exhibit N** to the undersigned.

[8] Again, the precise dates of this exhibit and all the following text exhibits are unknown, as these exhibits are photos of the undersigned's phone made by a third party, and the texts themselves were deleted.

with her history at Cover Girls, though at a ten-fold price increase.[9] In **Exhibit Q**, from late 2023, Ms. Nicholson expresses love and offers herself up: 'I'm yours." In **Exhibit R**, from late 2023, it's not the undersigned "popping up" at her apartment, but it's Ms. Nicholson asking: "Can I come stay at your house," and then not taking "no" for an answer; and continuing the request to stay with the undersigned in **Exhibit S**. And in **Exhibit S** she again expresses her dedication to the undersigned, "Your (sic.) my man."

After Ms. Nicholson was provided **Exhibits O** to **S** from her attorneys, she and the undersigned communicated further by text on December 11, 2024. Some of these texts are selectively shown in Dkt. 69-1 and discussed in Defendants' Supplement (Dkt. 69). **Exhibit T** is Ms. Nicholson's final text in this chain. In it she says that **Exhibits O** to **S** show **"**my desperate attempts to be represented by you because I didn't have time to find another lawyer…. I was doing what you made me do in order for you to handle my case properly. I was desperate, I put so much time and COUCH FEES into a case that you lost for me on purpose." But her reasoning is not supported by **Exhibit P** (showing an image of a cup in front of her vagina, asking "to borrow 2k" and stating that "It'll go to however much fun you want to have," and that she'll "remove the cup lol")**,** or by **Exhibit O** (stating that the undersigned gave her large amounts of money for sex), or **Exhibits R&S** (insisting she should stay with the undersigned at his residence, despite multiple refusals). Thus, her allegations about "couch fees" and "forced sex" to gain the undersigned's proper representation of her, fell completely apart when she tried to explain them in **Exhibit T.**

**5. The Undersigned Contact With Ms. Nicholson Did Not Violate Any Disciplinary or Ethical Rules**

Tex. R. Disc. Prof'l. Cond. 4.02(a) provides, in the most pertinent part, only that: "In representing a client, a lawyer shall not communicate or cause or encourage another to communicate about the subject of the representation with a person, organization or entity of government the lawyer knows to be represented by another lawyer regarding that subject, unless the lawyer has the consent of the other lawyer or is authorized by law to do so." The undersigned

---

[9] Dkt. 68-2, Declaration of B. Allen, alleges that she stated the undersigned made a "crude proposition" to her for sex in the back seat of his car, after their dinner on November 22, 2024. Not surprisingly, at that time it was Ms. Nicholson again soliciting sex, for $1000, and refusing to leave, and demanding to see the undersigned's bank statements, even after her offer was refused several times.

is the sole party to be charged with malpractice and professional misconduct by Ms. Nicholson: he was not representing anyone but himself when they communicated. He was and is, therefore, free to contact her as he sees fit without violating Rule 4.02(a) in any manner.

Moreover, **Exhibit V** shows that Ms. Nicholson initiated contact with the undersigned, and repeatedly asked for his comments, after he refused to do so at first. As noted above, the undersigned's crude language prompted Ms. Nicholson to ultimately reveal in **Exhibit T** the untruth of her allegations of professional misconduct and quasi-criminal extortion by the undersigned.

That Defendants' counsel, as members of the bar, would base a motion on Ms. Nicholson's unsworn accusations against an officer of the court is beyond outrageous. These unsworn allegations by Ms. Nicholson, including those repeated by Mr. Allen, are simply *not* factual contentions that "[H]ave evidentiary support." Fed. R. Civ. P. 11(b)(3).

**6. Conclusion**

Ms. Nicholson is of course not the real villain, as she was clearly being induced by Mr. Wallace to make damaging allegations against the undersigned, to disrupt the prosecution of this case; while he held out the promise that she would be able to profit from a malpractice case against the undersigned with him as the witness; and that she could profit from their collaborative effort to extort the undersigned by revealing his embarrassing, private materials. Clearly, he should be sanctioned for bringing a motion based on undated, unsworn text messages from a witness with a financial interest in damaging the undersigned, and especially where that witness had first approached Mr. Wallace with a *quid pro quo* offer for testimony, and where his firm had filed briefs showing that witness was a perjurer. Defendants' Motion (Dkt. 68) clearly violates Fed. R. Civ. P. 11(b)(3).

Defendants' Supplement (Dkt. 69) makes accusations of wrongful conduct, based on incomplete quoting of communications between the undersigned and their witness, Ms. Nicholson, where there is no legal basis cited (or known) for such wrongful conduct accusations. Defendants' allegations in its Supplement (Dkt. 69) fail to comply with Rule 11(b)(2), as they're not "[W]arranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law."

10

12

Respectfully submitted,


By: */s/ Eric P. Mirabel*
Eric P. Mirabel
Southern District ID No. 9708
3783 Darcus St.
Houston, Texas 77005
Telephone: (281) 772-3794
eric@emirabel.com

**ATTORNEY FOR PLAINTIFFS**


CERTIFICATE OF SERVICE

On this 13th day of December, 2024, I hereby certify that a true and correct copy of the foregoing document was served via the Clerk of the Court through the ECF system.  /Eric Mirabel/