IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

LIOSHA WILLIAMS, DESTINY ILORI, §
AND JALAYCIA DECLOUET, §
§
§
*Plaintiffs,* §
§
v. §
§  CIVIL ACTION NO. 4:23-cv-01025
§
A.H.D. HOUSTON, INC. d/b/a §
CENTERFOLDS; W.L. YORK, INC. d/b/a §
THE COVER GIRLS; D WG FM, INC §
d/b/a SPLENDOR, D. TEXAS §
INVESTMENTS INC / AHD HOUSTON §
d/b/a TREASURES GENTLEMENS §
CLUB; ALI DAVARI and HASSAN §
DAVARI, §
§
*Defendants.* §

**MOTION FOR SANCTIONS AGAINST WALLACE & ALLEN**

**Claim for Relief.** I, Eric P., Mirabel, was forced to agree to withdraw as counsel for plaintiffs in

this matter on January 17, 2025 because opposing counsel, Casey Wallace and Ben Allen ("Wallace

& Allen") disobeyed court rules and court orders, relied on fabricated and altered evidence, lied

repeatedly to the Court and obstructed discovery to cover their lies and proposed use of fabricated

and altered evidence; and, filed pleadings that consisted solely of immaterial (irrelevant) texts from

me to former co-plaintiff Chanel Nicholson, and then repeatedly read them to the Court to inflame

the Court, without noting that she had prompted and requested them, in violation of Tex.

Disciplinary Rules Prof'l Conduct 3.04(c)(2). I request the Court, under its inherent power (Local

Rules, Appendix A, Rule 10 "Inherent Power of Judges"), award me as damages my fees for my

work on this matter before my withdrawal, based on an hourly rate of $350/hour, and the costs and

expenses I incurred in pursuing this matter.

1

**TABLE OF CONTENTS**

PAGE

Claim for Relief……………………………………..…..…...…….…………….…..….……1

1. Summary of the Basis for the Claim for Relief ………….….…………….……….……3

2. Background and Relevant Events ………………….…..….……………......…6
A. Lack of a Pre-Filing Motion Conference.………….……………………………...…6
B. Anger Over Non-Payment ……………….…………………………………….......6
C. Pre-Subpoena Discussions by the Principals.……………….…………………….…7
D. I Tell Her to Accept Her Subpoena ……………………….………………………...7
E. Correspondence About Her Proposal to Lie in Court.……………………….……… 7
F. Nicholson's First Version of the "Disobey Your Subpoena" Allegation ………………. . .8
G. Nicholson's Selectively Edited Recording.………………………….………....…….9

3. Dec. 20, 2024 Hearing: Lies to the Court, Discovery Obstruction to Cover Them,
and Improper, Irrelevant Arguments …………………………………………………..10
A. Obstructing Discovery of Ms. Nicholson's "Disobey" Allegations; Lies About Her Other
Texts ……………………………………………………………………….…......… 10
B. The Improper Use of the Fruits of Their Cooperation. ……………….……………….…11

4. Wallace & Allen Lies About Me Intimidating the "Splendor Witnesses" ……..........……..13
A.No Witness Was Accused of Criminal Action by Me.…………..………………......…13
B.Their Misconduct Prompted My Emails to Dancer/<u>Witnesses.</u>.…………………….…..14

5. January 17, 2025 Hearing: Fabricated Evidence, More Lies and Disobedience of Orders..16
6. Wallace & Allen Misconduct After the Jan. 17, 2025 Hearing………….……...……….19
Conclusion And Request for Further Relief………………………………….……....20
**TABLE OF AUTHORITIES**

*Sender v. Mann*, 225 F.R.D. 645, 650 (D.Colo.2004) ……………………….….……15
Advisory Committee Notes to 1993 Amendments to Fed. R. Civ. P. 26(a) …….….…….…15
Fed. R. Civ. P. 26(a).……………………………………………………………...15
Tex. Disciplinary Rules Prof'l Conduct 3.03(a)(1) ………………………………...…20
Tex. Disciplinary Rules Prof'l Conduct 3.04(c)(1) ………………………………..…..20
Tex. Disciplinary Rules Prof'l Conduct 3.04(c)(2).………………….…………1, 5, 12, 19, 20
Local Rules, Appendix A, Rule 10 ……………………………………………….……1, 20
Court Procedures, Rule 5(A).……………………………………………….…6, fn. 4

**1. Summary of the Basis for the Claim for Relief**

The following is a summary of the egregious misconduct by Wallace & Allen noted in the

Claim for Relief above. The acts in this summary are then further specified in the following

sections of this Brief. Their acts of misconduct included: (a) at the hearing on Jan. 17, 2025 which

was to be a hearing on their contentions of misconduct by me: (i) they were ordered by the Court (who then left the courtroom) to play the recording they had brought, allegedly of a conversation between me and Ms. Nicholson, to support their allegation that I told her to disobey her subpoena from them. They did not play from the beginning or to the end of the clip, which would have allowed me to identify the time of the conversation it was cut from, whereby I would have known that in that conversation I had instructed Ms. Nicholson to obey her subpoena (which was in a part of the conversation that was edited out); (ii) Mr. Wallace falsely told the Court at the hearing, after the Court returned, that he had played the clip for me (after only playing part); (iii) Mr. Wallace gave me at the hearing, as my copy of an exhibit he intended to use, a blatantly altered email (**Exhibit N**) from me to Ms. Nicholson but where the words "don't show up in my court" had been added,[1] such that it appeared that I had sent that in an email to Ms. Nicholson; (b) they obstructed discovery and did not comply with my production requests calling for production of all their communications with Ms. Nicholson, which would have revealed which of them was responsible for fabricating the email (**Exhibit N**) and editing out the portion of the recorded conversation where I told her to obey her subpoena, and would have  allowed me to examine and establish that the recording had been selectively edited; (c) they based their Dkt. 68 motion "for protective order" (accusing me of egregious sexual misconduct) on text messages from former co-plaintiff Ms. Nicholson, who had told Mr. Wallace that she would testify for them if there was a "mutual benefit"

---

[1] The font of "don't show up in my court" in **Exhibit N** is larger and more brilliant than the rest of the text, and far below the rest of the message (a white on black, reverse image), thereby placing Wallace & Allen and anyone seeing it, on notice of that the email was altered by addition of those words. Moreover, it is directly contrary to Mr. Allen's summary of Ms. Nicholson's statement to him, *i.e.*: "Mirabel sent her written communications telling her to comply with the subpoena…" (Dkt. 68-2¶6). There is no credible basis for them to claim ignorance of the fabrication, because the actual email was filed by me as an Exhibit before the Jan. 17, 2025 hearing (Dkt. 81-1 (p. 7); **Exhibit E**, p. 7) and was also produced by me and submitted to them, before the hearing.

(**Exhibit E**, p. 8, highlighted) and then later brought her allegations of my misconduct to him at the time when he agreed to be her expert witness in her proposed malpractice case against me; (d) they indicated to the Court at the hearing on Dec. 20, 2024 that my representation of Ms. Nicholson was not "arms length" *or based on a contingent fee arrangement*, even though, before that hearing, I had produced my contingent fee engagement agreement with Ms. Nicholson to them; (e) they disobeyed local rules and this Court's rules by not having a conference with me (as I had demanded in an email, Dkt. 68-7, **EXHIBIT B,** highlighted text) before filing their motion "for protective order" (Dkts. 68) and its "supplement" (Dkt. 69), where Dkt. 68 accused me of coercing Ms. Nicholson to have sex as *quid pro quo* for my legal services. Had they complied with my written demand and with the rules and had a pre-filing conference, I would have learned the scandalous nature of the "protective order" they sought, and I would have discussed my responsive materials and proposed keeping out their scandalous, false allegations, and keeping my exonerative, responsive "Exhibit P" (that the Court found offensive) out of court. But I was instead forced in my response (Dkt. 70) to introduce texts from Ms. Nicholson[2] exonerating me by showing that in fact I was **paying her**, **in addition to** providing her legal services;[3] (f) they repeatedly violated Tex. Disciplinary Rules Prof'l Conduct 3.04(c)(2) by filing Dkt. 69 (again without a pre-filing

---

[2] These exhibits were **Exhibits O and P** (Dkts.78:18; 78:19). **Exhibit P** shows a pair of open female legs, wearing opaque grey panties and with an image of a cup and saucer in front of the pubic area. It is captioned "if you lend me $2000, I'll remove the cup." It's **an offer of nude exposure for cash**; and **not** a nude photo, as Court personnel (Ms. Karloss) mischaracterized it in a June 3, 2025 letter to me. In **Exhibit O** Ms. Nicholson stated colloquially that I had sex with her multiple times and paid her "*large amounts of money*."

[3] **Exhibits O and P** (Dkts.78:18; 78:19) I filed, had the effect of squelching, at the source, all Wallace & Allen claims that I was paid for legal services with sex, as evidenced by the fact that in over 60 "pleadings" filed by Ms. Nicholson after my withdrawal, many of which referred to my fraud, constitutional fraud, criminal fraud, and other civil and criminal violations, not one mentions anything about coerced sex or sexual misconduct, nor do any of the multitude of emails Ms. Nicholson wrote to the court coordinator Ms. Edwards, where she made a plethora of similar fraud and criminal accusations against me.

conference) and then reading out my "supporting" texts in Dkt. 69 at the hearings on Dec. 20, 2024 and again at the hearing on May 23, 2025. These texts are immaterial to any issue raised in Dkt. 68, and, Ms. Nicholson was clearly not intimidated by them, and didn't need a protective order, as: she had first circumvented blocks on her communications by me, and then had repeatedly requested my response to her highly offensive initial email; she had assured me that my response would be "off the record," and then, she responded to my responses (that Mr. Wallace "regretfully" read twice to the Court) by repeatedly ***asking me for more of the same type of comments to show "her lawyer*."** **Exhibit L,** pp. 5-end. Wallace & Allen introduced these inadmissible texts without the foregoing background information, thus implying they were sent by me without prompting from her. Without the foregoing context, they were inflammatory, and introduced as a blatant attempt to improperly prejudice the Court; (g) they lied to the Court at the hearing on Dec. 20, 2024 and stated that because of correspondence I sent to two of their witnesses who were dancers at defendant dba Splendor, these two dancers had refused to be their witnesses because they were "intimidated" by my correspondence. One of these two Splendor dancers (Ms. Johnson) told me in a call that she and all the Black dancers at Splendor were "definitely" victims of discrimination there. I also texted her and instructed her to ignore all of my earlier (allegedly intimidating) correspondence, and she texted back that **she was not going to testify**. **Exhibit U**. It is clear that ***they determined not to subpoena her*** to testify as their witness because ***she was going to testify favorably for plaintiffs***, and then they lied to the Court and claimed I intimidated her from testifying (where a subpoena has never been served to her). They never subpoenaed ***any dancers*** for the Feb. 9, 2026 trial.

Documentary support and further discussion of the lies and misconduct in subparagraphs (a) to (g) above are set forth below.

2. **Background and Relevant Events**

A. **<u>Lack of a Pre-Filing Motion Conference</u>**. Without first having a conference with me[4], as I demanded in writing (**Exhibit B,** subject line, highlighted text), Wallace & Allen filed their misnamed "Motion for Protective Order" (Dkt. 68) on Dec. 6, 2024; requesting dismissal as the relief.  Dkt. 68 alleges two significant acts of misconduct by me: (i) instructing their witness, Ms. Nicholson to disobey their subpoena, and (ii) my charging her "couch fees" and/or having a relationship where she exchanged sex for my legal services. Both these allegations were based on text messages from Ms. Nicholson to Mr. Wallace, and a declaration from Mr. Allen recounting a Nov. 23, 2024 conversation with Ms. Nicholson. Dkts. 68-2 to 68-5.

B. **<u>Nicholson's</u> <u>Anger Over Non-Payment.</u>** To understand the events leading to Ms. Nicholson's statements in her undated text in (Dkts. 68-3 to 68-5) one must turn back to events leading to email exchanges between me and Ms. Nicholson from May to August 2024.

Defendants filed a motion for summary judgment (Dkt. 33) on May 16, 2024, and I began contacting plaintiffs to obtain declarations from them to be used in their responses. I had been out of contact with co-plaintiff Liosha William for about two months, and she was not responding to my texts, emails and phone calls. I asked Ms. Nicholson (who had been dismissed as a plaintiff on March 18, 2024 (Order, Dkt. 31)) for assistance finding Ms. Williams, pursuant to my offer to her to be a consultant and investigator. Ms. Nicholson demanded payment to do so. *See* **Exhibit A**.[5] I had earlier offered to pay her consulting/investigative fees, upon her providing a detailed invoice,

---

[4] See Court Procedures, Rule 5(c) requiring "[A] statement that counsel … have conferred regarding the substance of the relief requested …"

[5] The precise dates of the texts in **Exhibit A** in May, 2024, are unknown, as these exhibits are photos of the undersigned's phone made by a third party. The texts themselves were deleted.

after settlement or receipt of funds; but she was demanding payment for "finding" Ms. Williams and asserting a claim to one-half of any settlement recovery. **Exhibit A,** p. 1.

**C. Pre-Subpoena Payment Demands by Nicholson.** Shortly thereafter, on May 21, 2024, Ms. Nicholson became enraged during a text exchange about lack of immediate payment of funds by me. She threatened to contact Mr. Wallace and offer testimony that the other plaintiffs were making up their claims, as she noted in her email at 2:36 PM on Aug. 10, 2024 (**Exhibit E**, p. 7, highlighted text), and that I had forced them to lie and file their claims. Mr. Wallace checked with me before accepting her calls or speaking with her. *See* **Exhibit C**. Ms. Nicholson later wrote me (**Exhibit E**, p.8, highlighted text) that in that first call, she told Mr. Wallace that she would testify for them if there was a "mutual benefit" to their cooperation.

D. **I Tell Her to Accept Her Subpoena**. In late July, 2024, Ms. Nicholson called and said opposing counsel's process server had left her a notice that they were trying to subpoena her, and she wanted to evade it. I encouraged her to accept the subpoena. *See* **Exhibit D**. She accepted the subpoena on 7.30.2024 (Dkt. 68-1).

E. **Correspondence About Her Proposal to Lie in Court**. In an email to me of Aug 10, 2024 (**Exhibit E** email, p. 8) about her interactions with Mr. Wallace, Ms. Nicholson stated: "So you said to ignore my subpoena? I responded later that day "no comment," then "I said no such thing." **Exhibit E** emails, pp. 7&8. We had just finished a conversation where she proposed foregoing her "benefit" from the Wallace relationship in exchange for some immediate compensation from me; but I had told her that if she lied in Court (as she again threatened), I would never pay her anything.

On Aug. 11, 2024 (**Exhibit E**, p. 1) I wrote her: "Please be sure to obey your subpoena …" We also had a phone conversation on Aug. 11, 2024 where I repeated that she should obey her

7

subpoena, and I would pay her documented consulting/investigative fees provided she didn't tell the case-damaging lies she had proposed to tell**.** After that call she stated "Cool, thanks for reassuring me." **Exhibit E,** top of p. **5.** The emails in **Exhibit E** all were before the first scheduled trial date: August 20, 2024. On Aug. 15, 2024 (Dkt. 44), the Court granted Defendants' motion for continuance, and the trial date was re-set to Nov. 18, 2024.

F. **Nicholson's Different First Version of the "Disobey Your Subpoena" Allegation.** Ms. Nicholson wrote Mr. Wallace on Nov. 5, 2024, promising him not to "say a single word" to me (about an unspecified subject) and then stating I had accused her of selling her testimony to him, and further: "he [meaning me] said I sold a testimony to you and I had better ignore your subpoena or he won't give me have [sic.] of his earnings from the case. I didn't go because he threatened me with money." **Exhibit F**.[6] Around the time of this text, Ms. Nicholson was working with another lawyer, Mr. Giddens, to bring a malpractice lawsuit against me.  **Exhibit G.** [7] She indicated that Mr. Wallace agreed to be her expert witness in such action, at a meeting with me on Nov. 22, 2024[8]; and Mr. Giddens confirmed that in a conversation I had with him. Their agreement to be each other's witnesses was clearly to their "mutual benefit" in accordance with her initial proposal to testify for Mr. Wallace. **Exhibit E**, p. 8.

---

[6] **Exhibit F** was provided to me by Ms. Nicholson in May 2025, after Wallace & Allen were repeatedly asked but refused to obey my discovery requests from August and September of 2024 (served well before any of the hearings), which respectively called for all communications with Chanel Nicholson and any witnesses, and all Documents to be used at trial. *See* **Exhibit J2,** highlighted text**.**

[7] **Exhibit G** is a letter to me from her malpractice counsel. It is dated November 18, 2024, but was received by me on November 25, 2024, in an email from him.

[8] See also **Exhibit E**, p. 1 (dated Nov. 7, 2024): "I've spoken with Casey [Mr. Wallace], just giving you the courtesy of letting you know."

G. **<u>Nicholson's Selectively Edited Recording.</u>** Shortly before the meeting with me on Nov. 22, 2024, I spoke at length on the phone to Ms. Nicholson.[9] The next day (November 23, 2024) Ms. Nicholson spoke with Mr. Allen (*see* Dkt. 68-2, his declaration). Mr. Allen's declaration (Dkt. 68-2, para. 6) quotes her as saying that I told her to "disobey the subpoena and don't go to Court. She told me she had recordings of this call." Yet in the recorded clip played in the courtroom for me on Jan. 17, 2025, my voice does not say "disobey" or anything similar. Instead, in response to Ms. Nicholson's question: "do you want me to come or not," my response is: "Probably not. There's really nothing for you to testify about. I mean, I'm not saying absolutely not. At this point, I'm just saying, yeah, you know, like, I don't really see that it's going to be that helpful." **Exhibit I,** p.1. Further, Mr. Allen's recounting of her statement in his 11.23.24 declaration as "disobey the subpoena and don't go to Court" is very different from her (written) earlier 11.5.24 text to Mr. Allen's partner, Mr. Wallace, where she stated *i.e.*, "[I]gnore your subpoena or [I] won't give [her] have [*sic*.] of [my] earnings…" **Exhibit F.** Mr. Allen's declaration does not explain why he didn't ask her about the significant variance between her oral statement he recounted in his declaration, and her earlier written statements she submitted to them.[10] Mr. Allen's declaration also does not explain why he did not ask her about the difference between her stating I was charging "couch

---

[9] **Exhibit I** is discussed in the Basis for the Claim for Relief above; edited parts of that phone conversation, were played by Mr. Wallace for me, with the Court absent, on Jan. 17, 2025.

[10] Note that Ms. Nicholson refuted all her prior statements that I said to disobey her subpoena in an email to Lisa Edwards of June 12, 2025 (cc: me), where she stated: "I put in the document that I swear under penalty and purgery [*sic*.] ERIC MIRABEL NEVER TOLD A 'WITNESS' to disobey a subpoena." **Exhibit H** (p. 1). She also stated under penalty of perjury, in a letter to Ms. Edwards of 3.22.2026 (**Exhibit H**, p. 4), that "I have never been instructed by Eric Mirabel to disobey a subpoena as a witness in any matter."

fees" and her texts to Mr. Wallace, that did not mention me demanding sex in exchange for legal services.[11]

**3. Dec. 20, 2024 Hearing: Lies to the Court, Discovery Obstruction to Cover Them, and Improper, Irrelevant Arguments**

A. **Obstructing Discovery of Ms. Nicholson's "Disobey" Allegations; Lies About Her Other Texts**. At the Dec. 20, 2024 hearing on their "motion for protective order" and its supplement (Dkts. 68 & 69), Mr. Wallace told the Court a series of lies, and read aloud (with "regret") irrelevant texts which were inflammatory, without context. Regarding their contention that I told Ms. Nicholson to disobey her subpoena, he stated: "But it's backed up by the emails -- excuse me, the text messages that are part of the exhibits to our motion where he has told her 'Do not ever show up in his courtroom. Do not appear.'"[12] The text messages from Ms. Nicholson (**Exhibit F**) to him**,** however, stated something quite different, *i.e.*, in it, Ms. Nicholson said I said she "sold a testimony to" Mr. Wallace and that I said she "had better ignore [the] subpoena or [I] won't give [her] have [*sic*.] of [my] earnings from the case. I didn't go because he threatened me with money." That document was never produced by Mr. Wallace,[13] though being called for by my discovery requests. **Exhibit J2**, highlighted text.

Mr. Wallace went on to lie more to the Court at the 12.20.2024 hearing, stating (**Exhibit J1** 5:1-7) that she said: "[T]hat her relationship with Mr. Mirabel was not one of arm's length transaction between a client and the attorney wherein she either paid him for his services with money or had a contingency fee relationship with him for the outcome of the case but instead was one of sex for legal services." The text messages (Dkts. 68:3-5) attached to support their Dkt. 68

---

[11] *See* discussion of Dkts. 68-3 to 68-5 in **Section 3** below.

[12] Transcript of that proceeding, **Exhibit J1** 4:22-25.

[13] I obtained it from Ms. Nicholson, and she stated this text exchange took place on Nov. 5, 2024.

"motion for protective order" say no such thing.[14] And I had produced my engagement agreement for contingent fee representation of Ms. Nicholson (**Exhibit K**)[15] to Mr. Wallace on Dec. 17, 2024: so it was in Mr Wallace's possession before the hearing and thus he knew that my representation **in fact was** a "contingency fee relationship."

Mr. Wallace also claimed (**Exhibit J1** 5:7-14) that Ms. Nicholson's text messages (*i.e.*, Dkt. 68-3 to 68-5) stated that I said: "That she was to obey and be grateful. Grateful meaning you will exchange sex -- continue to exchange sex in return for my legal representation." None of her text messages in Dkt. 68-3 to 68-5 say anything close to "exchange sex in return for my legal representation." Instead, her closest statement is (Dkt. 68-4, top p. 2) is that "**he made me feel like if I don't obey and be grateful he will put certain things in the case to make it look crazy.**" (emphasis added)

B. **The Improper Use of the Fruits of Their Cooperation**. Mr. Wallace also read at the hearing (**Exhibit J1** 5:24-6:12) from their "Supplement" Dkt. 69, [16] the immaterial, irrelevant, and, without context, ostensibly inflammatory excerpts from texts then I had sent Ms. Nicholson, after her repeated requests for my responsive comments to her violently angry profane text message (**Exhibit L**, p. 1, top), which she had sent me after: (i) circumventing my blocks on her communications (she sent her texts to me from different numbers so I couldn't block them), (ii) after she assured me in writing *twice* that our communication were "off the record," (**Exhibit L** p.

---

[14] Dkts. 68-3 to 68-5 make no mention of whether we had any kind of fee agreement, or that she paid with sex for legal services. There are some implications in those texts that I may have been asking her to take unwanted showers or baths with me: and that's the worst one could possibly construe from her texts.

[15] **Exhibit K** is p. 1 of the engagement agreement I produced in its entirety.

[16] Both Dkt. 68 and Dkt. 69 were filed by Wallace & Allen without having a conference before filing, as I demanded. *See* **Exhibit B,** highlighted text.

3), and (iii) most significantly, after receiving my responses, she had repeatedly pressed for more comments of the same nature, stating, *inter alia*, "Send something else for me *to show my lawyer* as you dig a deeper hole for yourself. Keep it coming."[17] "Keep the messages coming." "Wow keep it coming." "What else?" "That's it?" **Exhibit L** pp. 5-end. She also continued communication with me up to the present despite my repeatedly blocking her. Wallace & Allen certainly knew about her "show me more" texts because even if she didn't send them with her texts they included in Dkt. 69, I produced the entire email chain to them before the hearing. Mr. Wallace's statements that my texts represented "misconduct on behalf of a lawyer towards witnesses" (**Exhibit J1** 6:15) and "un-veiled attempts to intimidate witnesses" (Dkt. 69¶4) were blatant lies, and filing and reading these texts in court[18] was in clear violation of Tex. Disciplinary Rules Prof'l Conduct (hereinafter "DR") 3.04(c)(2) as they were immaterial to any issue raised in their "protective" motion, Dkt. 68. They were filed and then read by Mr. Wallace to the Court **twice** (at hearings on Dec. 24, 2024 and May 23, 2025), without context, solely because they were made to appear inflammatory and would likely prejudice the Court.

And Mr. Wallace reading out these texts at the Dec. 20, 2024 hearing did in fact affect the Court, and led directly to my withdrawal. As a direct result of Mr. Wallace's reading these texts, the Court issued an order (**Exhibit J1** 16:18-23; 17:23-25) that I was to have no contact with witnesses, including Ms. Nicholson. Ms. Nicholson offered on Dec. 26, 2024 **(Exhibit M**, last

---

[17] As part of the Nicholson/Wallace cooperation, some texts from me were filed *by her lawyer* in Dkt. 69. The close ties they had through this period is also displayed after her first text in **Exhibit L** (bottom of p. 2" where she states: "Casey [Mr. Wallace] is letting my lawyer know what's really going on."

[18] At May 23, 2025 hearing, Mr. Wallace read these texts to the Court again. I explained that asking Ms. Nicholson for her text where she proclaimed my prowess at sex was directly relevant rebuttal to Wallace & Allen's contention that I was demanding sex from her for my legal services; and there was nothing improper about requesting it from her.

page) to provide me the materials she had provided to Mr. Wallace on Dec. 21, 2024 (**Exhibit M**, pp. 2-4). If I had had the fabricated email that Mr. Wallace first provided me at the hearing on Jan. 17, 2025 (**Exhibit N**), and the selectively edited, recording clip of my conversation with her, I would have been able to prepare my defense thoroughly against them: including a forensic examination of the recording. But I did not accept Ms. Nicholson's Dec. 26, 2024 offer to give me these materials, as I was under the Court's "no contact" Order.[19] Mr. Wallace refused to produce those materials, though they were called for by me in two different sets of discovery requests. **Exhibit J2**, highlighted text. The Court did not require him to so, notwithstanding my reporting his discovery violations to the Court.[20]

**4. Wallace & Allen Lies About Me Intimidating the "Splendor Witnesses"**

**A. No Witness Was Accused of Criminal Action by Me**. Mr. Wallace also claimed at the Dec. 20, 2024 hearing that I had intimidated some of his other witnesses from testifying through a letter I had sent some of his dancer witnesses, where I stated I intended to take their depositions and ask them, among other things, about their compliance with certain adult entertainment related county regulations and city ordinances, which I believed applied to dancers at Splendor. *See* **Exhibit P** (my letter to Ms. Johnson, a Splendor dancer). Mr. Wallace claimed (**Exhibit J1**, 7:9-22):

> I know for a fact at least two witnesses on my Rule 26(f) [*sic.*] disclosures will now not testify. … They are dancers who danced at a club called Splendor …  on the north side of Houston." **They received correspondence … about allegedly committing a crime, a class A misdemeanor, for violating Harris County sanctuary business regulations,** which do not apply to clubs in the city of Houston.

---

[19] *See also* my Jan. 5, 2025 letter to the Court, **Exhibit O**, 7th to 9th line from the bottom of page 2, noting that Ms. Nicholson had made offered those materials to me, but I could not accept it.

[20]  In my Jan. 5, 2025 letter to the Court, **Exhibit O**, I was requesting the Court's assistance in obtaining all materials Mr. Wallace intended to use at the hearing, in accordance with the Court's procedures, where motions to compel production are not initially permitted.

> The city of Houston regulations apply. Those regulations because of a consent decree actually don't apply. Nevertheless, **they were accused of committing a crime and now aren't going to come testify.**

There is nothing in **Exhibit P**, the letter I wrote to Ms. Johnson (one of the two dancers at Splendor[21] identified by Mr. Wallace as witnesses) accusing her of committing a crime. That was the first lie by Mr. Wallace in his statement above. And, it was, in fact, due to some more of his obstruction and deception (as explained below) that I was forced, as a practical matter, to write the letter (**Exhibit P)** to Ms. Johnson and his other dancer witnesses.

**B. Their Misconduct Prompted My Emails to Dancer/Witnesses**. Mr. Wallace's Rule 26(a) initial disclosure of Oct. 8, 2024 (**Exhibit Q**) and September 9, 2024 (**Exhibit R**), indicate that he, or someone associated with him, had substantive discussions about Ms. Johnson's testimony:

> Ms. Johnson is an entertainer at Splendor. Ms. Johnson is familiar with and can testify about the day-to-day operations of the club, her (and other dancers') interactions with managers and other staff members of the club, and her experiences since becoming an entertainer at Splendor. Ms. Johnson can also testify to the method and manner in which entertainers are interviewed by managers and contracted with the club. Ms. Johnson can also testify about the club's zero tolerance policy relating to discrimination, including racial discrimination, and she has personal knowledge of the ratio of dancers by race, e.g., Caucasian entertainers, African American entertainers, and Hispanic Entertainers.

Virtually the same lengthy statements are made about the subject matter of Ms. Mace's prospective testimony in the initial disclosures for her. *See* **Exhibits R&Q,** highlighted. But Ms. Johnson told me in a conversation with her on Oct. 9, 2024 (the day I first texted her, *see* **Exhibit U**) that no one from any law firm had ever spoken to her, and the Black dancers at Splendor were simply told to write down their contact information and submit it to the manger. Mr. Wallace's Rule 26

---

[21] The letter to the other dancer at Splendor, Ms. Mace, was sent a letter by regular mail and is essentially identical to the Johnson letter (**Exhibit P).**  Ms. Mace and Johnson were the two dancer/witnesses at Splendor, that Mr. Wallace, with only 11 days to go until deposition cut-off, changed his stance and notified me he would not accept service of deposition notices for them (see further discussion below).

statements were intended to and did mislead me into thinking Ms. Mace and Johnson would be among his witnesses (including three other dancers), and induce me to waste effort pursuing their depositions, when he had in fact **not** even spoken to them before he submitted his Rule 26 statements about the substance of their testimony. *See Sender v. Mann*, 225 F.R.D. 645, 650 (D. Colo. 2004) ("'[L]itigants should not indulge in gamesmanship with respect to the disclosure obligations.' See Advisory Committee Notes to 1993 Amendments to Fed. R. Civ. P. 26(a)."

On October 7, 2024, after I threatened to begin depositions of eight witnesses, including Ms. Johnson and Ms. Mace, the following week (**Exhibit S,** last email in the chain), I spoke with Mr. Wallace about scheduling depositions. We agreed, and he confirmed in an email (**Exhibit S,** first and second emails in the chain) that he would provide suitable dates for all requested witnesses "ASAP." He indicated in the call that depositions for all these witnesses could be noticed through him.

Then the next day, on October 8, 2024, they served **Exhibit Q**, their third amended Rule 26 initial disclosures. A phone number, but no email address, was provided for Ms. Mace, and the phone number was nonfunctioning. A phone number, but no email address, was provided for Ms. Johnson.[22]

In his email response on October 8, 2024 (**Exhibit T,** highlighted text), Mr. Wallace stated for the first time, that he would **not** provide deposition dates for the five dancer witnesses (including Ms. Johnson and Mace), because, "[T]hey are not employees, agents or persons under

---

[22] In addition, no phone or email was provided for another dancer (Tishina Kennedy) and a false home address (which was the police memorial in Memorial Park) was provided another dancer, Ms. Robinson.

the control of the Defendants.  They are independent contractors …" At that time, there was only 11 days to go until discovery/deposition cut-off, so I was left to determine how to contact these five dancers and schedule and take their depositions in that time.

The letter I sent the dancers (**Exhibit P),** where I noted I intended to ask about their compliance with ordinances and regulations, was intended to prompt them to contact counsel: who I could then arrange their depositions through in a timely manner. After I found out that most but not all of the ordinances did not apply (because of a consent decree Mr. Wallace was instrumental in entering, but which did not appear with the ordinances and regulations) I informed those dancers that I could contact (including Ms. Johnson, **Exhibit U**) to ignore my prior statements. She texted back that she was not going to testify (**Exhibit U**), indicating that her decision not to was **not** because of my allegedly "intimidating" earlier letter: unlike the lie that Mr. Wallace told at the hearing, "[T]hey were accused of committing a crime and now aren't going to come testify." **Exhibit J1,** 7:21-22.

Moreover, Ms. Johnson told me in a call[23] that she and all the Black dancers at Splendor were "definitely" victims of discrimination there. And although Mr. Wallace claimed in Court that she wasn't "going to come testify," he never subpoenaed her. The simple explanation is that he determined not to use her testimony once he spoke with her and learned she felt there was racial hiring discrimination at Splendor. His statements to the Court that I intimidated her and Ms. Mace from testifying were egregious lies, again, supported by his discovery obstruction.[24]

**5. January 17, 2025 Hearing: Fabricated Evidence, More Lies and Disobedience of Orders**

---

[23] See **Exhibit U**, we connected in a call after the first two texts, where I identified myself to her.
[24] Mr. Wallace also did not produce his records of conversations with Ms. Mace or Johnson, though they are called for. **Exhibit J2,** Request No. 40.

Mr. Wallace disobeyed the Court's order, given at the Jan. 17, 2025 hearing before the Court left the courtroom, to play the recording he brought, allegedly of my statement to Ms. Nicholson to disobey her subpoena. He started the recording clip after its actual start.[25] He also did not play the clip to the end, where Ms. Nicholson says, "No, it's just … Jason. Be quiet. It's just, and it's a lot and me ***not being able to contact you for months***. It kind of it's like a …" Her emphasized part of the statement would have allowed me to identify the time of the conversation (Nov. 22, 2024) it was cut from, because at that point we had not spoken for several months. I would have then known that in that conversation, I had instructed Ms. Nicholson to obey her subpoena (which was in a part of that Nov. 22, 2024 conversation that they edited out). Not playing it to the end placed me at a significant disadvantage, as I could not place the conversation, and did not recall the remainder of it.[26]

After playing part of the recording clip, the Court returned and inquired if Mr. Wallace had played the recording. Mr. Wallace falsely stated that he had (after only playing part). He then walked over and handed me, as my copy of his exhibit for the hearing, a blatantly and ostensibly altered email (**Exhibit N,** *see* fn. 1, *supra*) where the words "don't show up in my court" had been added, such that it appeared that I had sent that in an email to Ms. Nicholson. I immediately held it up and loudly told the Court it was fabricated. We were then ushered to a meeting in a jury room, where the Court directed comments to me that indicated he thought I had disgraced the profession, and then characterized Mr. Wallace as a litigator who had "sharp elbows." The Court's apparent

---

[25] Ms. Nicholson, after the hearing, sent me the recording clip she told me she had sent Wallace & Allen. I of course don't know what was sent to them as they obstructed and refused to answer my discovery requests (**Exhibit J2**, highlighted), and never provided me the clip they played, before or after the hearing.

[26] Again, Mr. Wallace did not produce the clip before the hearing, and it was called for in several of my discovery requests. **Exhibit J2**, highlighted text.

indifference to Mr. Wallace using fabricated evidence made clear to me that I could best serve my clients' interests by withdrawing and seeking other counsel for them, which I did.[27]

According to Ms. Nicholson's texts to me, she provided Mr. Wallace the altered email (**Exhibit N**) and the recording clip almost one month before the hearing.[28] But at the hearing he falsely stated to the Court he had held the recording clip for "about a week": apparently as he realized he needed to lie and to try excuse not providing it to me in advance of the hearing.  Had I been provided these materials before the hearing, I would have had time to analyze them and prepare the documentary responses and rebuttals set forth herein, and would not have agreed to withdraw. And I would have then known the recording clip was from our conversation of 11.22.24, where I told her to obey her subpoena, in portions of that conversation that were deleted by them.

Mr. Wallace's stream of lies to the Court, with his discovery obstruction and disobedience of court orders, ultimately had their intended effect. I withdrew and substitute counsel failed to timely assert the most valuable claims any plaintiff had in the case: *i.e.* Liosha Williams' claims against the Defendant dba Treasures for several years of hostile work environment/racial harassment, and her being forced her to work only unlucrative day shifts. These claims were denied (Minute Order of 1/16/2026) when made several months late, in December 2025, by motion and emergency motion, Dkts. 185; 186. I was representing Ms. Williams under a contingent fee

---

[27] At the time I took the podium and agreed to withdraw, I commented to the Court that Mr. Wallace's references to my texts in Dkt. 69 were a hoax on the Court; and I noted that Ms. Nicholson's responses had asked for more of my "offensive" comments, as shown in **Exhibit L,** pp. 5-end.

[28] Ms. Nicholson texted and told me that on Dec. 21, 2024 she had given him these materials (**Exhibit M**, pp. 2-4, highlighted); and then asked if I wanted to see them as well on Dec. 26, 2024. **Exhibit M,** p. 4, highlighted**.** I could not respond and accept her offer due to the Court's order, issued at the earlier hearing on Dec. 20, 2024 (**Exhibit J1** 16:18-23; 17:23-25), that I not contact her.

agreement, and these lost claims represent significant lost value to us both. My substitute motion to add D. Houston, Inc. dba Treasures as a defendant was granted by the Court on Jan. 27, 2025, after my agreement to withdraw, when I could not file another amended complaint adding that defendant myself.

**6. Wallace & Allen Misconduct After the Jan. 17, 2025 Hearing**

Pursuant to the agreement I made to withdraw at the Jan. 17, 2025 hearing, I filed a withdrawal on Jan. 28, 2025 (Dkt. 84) which was granted on Feb. 25, 2025 (Dkt. 89). I made over seventy solicitations to attorneys holding themselves out as representing plaintiffs in employment cases, and could find no one willing to assume the case. So, to try to serve my clients' interests, and armed with a written statement by Chanel Nicholson that she was not told to disobey a subpoena by me, I filed a motion for re-appearance on March 9, 2025 (Dkt. 92). I attended a hearing on a different matter on March 14, 2025 and asked to re-appear. The Court set my motion to reappear as counsel for May 23, 2025, by Minute Order.

Plaintiffs Ilori, Declouet and Williams found substitute counsel and he appeared on March 27, 2025 (Dkt. 122). Before the hearing on May 23, 2025, plaintiff Castro had indicated she wanted me to continue to represent her in the case. Plaintiff Smith was not responding to my inquiries about whether she wanted to continue.

At the hearing on May 23, 2025, Mr. Wallace began his presentation by again reading the irrelevant text messages in Dkt. 69; even though I had drawn attention to the impropriety of doing so at the Jan. 17, 2025 hearing when I stated that his reference to these texts was a hoax on the Court. Fn. 27. He then added a reading of another text I sent to Ms. Nicholson in February, 2025, **after I had agreed to withdraw**, wherein I had made graphic references to sex to convey to her

19

stop contacting me; after I had received a stream of her extortion demands sprinkled with death threats. It's hard to imagine how a litigator could be more violative of DR 3.04(c)(2) than was done by Mr. Wallace.

After the hearing, the Court suspended proceedings and stated an intention to refer the matter to the State Bar for investigation. May 23rd Minute Order.

I later contacted Ms. Castro. She did not want to continue and Ms. Smith did not respond. I had no clients in the case. I decided not to delay my former clients' trial by forcing a bar investigation. I withdrew my reappearance motions (Dkt. 113, granted 6.6.2025 (Dkt. 170)).

**Conclusion And Request for Further Relief**

Now that my former clients have had their day in Court, I feel I can pursue my claims for sanctions against Wallace & Allen without delaying their cases. I respectfully request a hearing (a motion for oral hearing is filed herewith) to conclusively establish Wallace & Allen lies to the Court (DR 3.03(a)(1)), disobedience of Orders and rules (DR 3.04(d)), habitual discovery obstruction (DR 3.04(c)(1)) (I wrote four letters to the Court about various obstructions by them) and improper argument on irrelevant matters (DR 3.04(c)(2)). Their contempt for the Court's rules is such that when in March 2025 I requested Mr. Wallace to provide me, under my discovery requests, his long-overdue communications with Ms. Nicholson, he wrote back that I needed drug and/or alcohol counseling. I ask the Court to invoke its inherent power and the authority (Local Rule, Appendix A, Rule 10) and award me as sanctions: my fees for my work on this matter before my withdrawal, based on an hourly rate of $350/hour, and the costs and expenses I incurred.

Respectfully Submitted,

By: /s/ Eric P. Mirabel Texas State Bar No. 14199560, Southern District ID No. 9708, eric@emirabel.com, 3783 Darcus St., Houston, Texas 77005, Tel: 281 772-3794

CERTIFICATE OF SERVICE

On this 19ᵗʰ day of May, 2026, I hereby certify that a true and correct copy of the foregoing document was served on all counsel via the Clerk of the Court through the ECF system.

/s/*Eric P. Mirabel*

CERTIFICATE OF CONFERENCE

I emailed a draft version of this motion to Mr. Wallace (counsel for defendants) and Mr. Barrett (counsel for plaintiffs) in the morning of March 28, 2026, told them I intended to file the motion by Monday (March 30) noon, and asked if they would oppose, consent or wanted to confer. They both responded that they opposed it by email. I emailed Mrrs. Wallace and Barrett again on May 18, 2026, and asked if they would oppose, consent or wanted to confer about this motion, and a motion for oral hearing and a motion to intervene. Mr. Wallace stated he opposed but asked to see all the motions, for consideration, and they were all sent him that day. On May 19, 2026, he did not respond to inquiries. Mr. Barrett never did not respond to the May 18ᵗʰ inquiry, and his opposition is assumed, based on his earlier opposition to the motions for sanctions and to intervene.

/s/*Eric P. Mirabel*      Date: 5.19.2026