EXHIBIT J1

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

CHANEL E. M. NICHOLSON, et    )
al,                           )
                              )
            Plaintiffs,       )   Civil Case No. 4:23-cv-01025
                              )
vs.                           )
                              )
AHD HOUSTON INC, et al,       )   Friday, December 20, 2024
                              )
            Defendants.       )
_____


TRANSCRIPT OF MOTION HEARING
HONORABLE ELIZABETH K. DILLON PRESIDING
UNITED STATES DISTRICT COURT



A P P E A R A N C E S

For the Plaintiff:        Eric Paul Mirabel (telephonically)
                          Attorney at Law
                          3783 Darcus St, 3783
                          Houston, TX 77005

For the Defendant:        Casey T. Wallace
                          Wallace & Allen
                          440 Louisiana, Ste 590
                          Roanoke, VA 77002

                          Barry M. Barnes
                          Barry Barnes and Associates PLLC
                          440 Louisiana St, 1880 Lyric Centre
                          Houston 77002

Official Court Reporter:     Donna Prather
                             515 Rusk St., #8004
                             Houston, TX  77002

Proceedings taken by Certified Stenographic Reporter;
transcribed using Computer-Assisted Translation

(Proceedings commenced at 8:58 AM.)

THE COURT:  Good morning.  You may be seated.

Cause number 4:23-cv-1025, Chanel Nicholson, et al, versus AHD Houston, Inc.

Counsel for the plaintiff, your appearance for the record.

MR. MIRABEL:  Eric Mirabel, appearing for the plaintiff.  Good morning, Your Honor, and everybody.

THE COURT:  Counsel for defense, your appearances for the record.

MR. WALLACE:  Casey Wallace on behalf of defendants, and joined by my colleague Barry Barnes.

MR. BARNES:  Barry Barnes, Your Honor.

THE COURT:  Very well.

Counsel, I called you in today for purposes of hearing defendant's motion for protective order.  Specifically, there was some troubling assertions in the motion for protective order, and I wanted to give defendant the opportunity to present them to the Court and, just as importantly, to give the Plaintiffs' attorney an opportunity to respond.

So with that being said, Mr. Wallace.

MR. WALLACE:  Thank you, Your Honor.

THE COURT:  And if you're going to speak from counsel table, pull your mike there in front of you, please.

MR. WALLACE:  Would you prefer that I --

THE COURT:  No, counsel table is fine just as long as you have the mike in front of you.

MR. WALLACE:  Thank you, Your Honor.

As you noted, we filed a motion for protective order on December 6, 2024, detailing some rather disturbing activity and disturbing communications between plaintiff's counsel and a witness that had been subpoenaed to appear in this case for trial.

Prior to that, however, as shown in our exhibits, on October 14, 2024, we also filed a letter with this court outlining some other disturbing communications that plaintiff's counsel had had with some witnesses that had been designated in our Rule 26 disclosures.

In that communication that's detailed in the October 14, 2024, letter, Mr. Mirabel had sent to witnesses that had been designated to testify, or potentially testify, that he was going to notice them for deposition and going to question them about the fact that they had committed a class A misdemeanor that would subject them to a year in jail and a several-thousand-dollar fine.

And the purpose of that letter was, in our opinion, to scare them off.  Don't come testify.  Because if you come and testify, I'm going to accuse you of having committed a crime, and you're going to jail.

That was disturbing enough for us to submit that letter to you, Judge.  And I know that you've read it and considered it.  But then when we approached Ms. Nicholson, a former plaintiff in this lawsuit, a former person that Mr. Mirabel represented at one point but no longer represents, to ask her where we could resubpoena her so that she could appear at trial, she disclosed to us some very, very disturbing communications be that she has had with Mr. Mirabel.

The first one that she told us about was that while he had sent her an email saying comply with the subpoena, that on the telephone he did just the exact opposite telling her disobey the subpoena and do not go to court.

Our position is that's both witness intimidation and witness tampering under the federal statute.  And Ms. Nicholson has reported she has all this on record.  That when she talks to Mr. Mirabel, or when she talks to me, or when she talks to anybody, she records the conversation.  I have asked her for the recordation.  She told me she would get it to me.  I have not gotten it yet.

Nevertheless it was disturbing that he told her not to go.  But it's backed up by the emails -- excuse me, the text messages that are part of the exhibits to our motion where he has told her "Do not ever show up in his courtroom. Do not appear."

And then she goes on to describe the fact -- and I'm disturbed to say this to you, Judge -- that her relationship with Mr. Mirabel was not one of arm's length transaction between a client and the attorney wherein she either paid him for his services with money or had a contingency fee relationship with him for the outcome of the case but instead was one of sex for legal services. Something that got more and more bizarre the more and more communications Mr. Mirabel had with Ms. Nicholson as outlined in the text message exchanges between Mr. Mirabel and Ms. Nicholson. Things like, "Your life is in my hands. You're not smart enough to do this on your own." That she was to obey and be grateful. Grateful meaning you will exchange sex -- continue to exchange sex in return for my legal representation.

As you can see, we then filed our motion for protective order alleging witness intimidation citing 18 U.S.C. 401 and the ex parte *Robinson* case and its progeny from the supreme court which provides that this Court has the authority on its own to make corrective action for counsel's misbehavior.

I hoped that that motion alone would have put an end to the conduct that Mr. Mirabel had towards his client and towards the witness that had been subpoenaed to appear. It did not, however, stop. Mr. Mirabel turned up the heat against Ms. Nicholson. Sending her emails asking, "Do you

have a copy of the text you sent me in August that I'm the best at ever at eating your --" and I'm not going to say the word, Judge.  You read the words.  "Can you resend it?  I deleted mine.  You're starting to work with Casey --" that's me, Your Honor "-- in May.  He --" blanks "-- you in every orifice, figuratively speaking, because of your evil greed for a non-existent malpractice case.  I busted ass for three years based on your lies working for Cover Girls in 2017.  You got fired for sucking --" blank "-- after five days in 2016.  You're a --" blank "-- street retard.  Wallace didn't pay --" blank "-- and you became his --" blank.  "You stupid evil --" blank.

This is to a witness that has been subpoenaed that is designated to testify in this case.  I can't imagine more misconduct on behalf of a lawyer towards witnesses who are both designated and subpoenaed to testify and who have been designated as witnesses pursuant to Rule 26.

I don't like bringing these motions.  I've never brought a motion, ever, like this in my entire professional career.

I don't necessarily accept the original facts that Ms. Nicholson made against my client in the original lawsuit.  But Judge, whether I accept them or not, whether she is a plaintiff against my client or aligned on my side of the case, no lady in this country deserves to be treated the way

Ms. Nicholson has been treated by her own lawyer, now ex-lawyer, while sitting as a potential witness to testify before you and a jury in this case or any of the other Rule 26 witnesses who were threatened with prosecution, essentially, for simply being a dancer, an exotic dancer, in the city of Houston, for violating the city of Houston's regulation, for violating nonexistent County regulations, and for daring to challenge Mr. Mirabel's side of this coin.

Judge, we believe, and I know for a fact at least two witnesses on my Rule 26(f) disclosures will now not testify. I've gone to visit with them. They are dancers who danced at a club called Splendor, DWGFMD doing business as Splendor on the north side of Houston. They received correspondence, and I've otherwise talked to other witnesses who have received correspondence, about allegedly committing a crime, a class A misdemeanor, for violating Harris County sanctuary business regulations, which do not apply to clubs in the city of Houston. The city of Houston regulations apply. Those regulations because of a consent decree actually don't apply.

Nevertheless, they were accused of committing a crime and now aren't going to come testify.

We have asked, yes, for this Court to exercise its ultimate authority, which is to dismiss this case because of the witness tampering, because of the witness intimidation.

That's a long road to go, I realize that. We're asking for the ultimate relief. Please dismiss this case and let these plaintiffs go about, if they have a malpractice claim against -- if they have any kind of claim against Mr. Mirabel, they can pursue it. If not, that's fine also. But we believe our case has been crippled, in some degree, because of the witness tampering and the witness intimidation. We're asking help. We're asking for help. So that's why we're here today.

THE COURT: Well, in regards to the relief that you have just spoken on, there are remedies short of that that could be employed. The conduct that you speak of, if true, falls on Plaintiffs' counsel, not on the litigants themselves.

And by dismissing this case, the remedy that you suggest, the harm falls to Plaintiffs who would not be allowed to pursue their allegations in court. Whether they're true or not would be ultimately determined by a jury.

In regards to your case being crippled, you've not yet suffered the harm of them not testifying because the case has not been called as of yet.

So let me hear from Mr. Mirabel.

And Mr. Mirabel, I have seen and read some of the texts that Mr. Wallace has referred to. In addition, I've seen your filing. And I can tell you, part of the reason I called this hearing, I was quite disturbed by some of the

exhibits that you filed here in a Federal District Court.

I can tell you that if the allegations that Mr. Wallace has just laid out -- and I can tell you that there's already some proof of that in the text messages that I've read -- if they are true, they present a very troubling picture.

So with that being said, I'm going to give you the opportunity to respond to Mr. Wallace and offer up any explanation that you deem appropriate to this Court.

MR. MIRABEL:  Thank you very much, Your Honor.  I'd like to start with if you read the text that Mr. Wallace quotes to --

THE COURT:  And Mr. Mirabel, you're going to have to speak up, because I'm having a hard time hearing you.

MR. MIRABEL:  Sorry.  Is that better?

THE COURT:  Some.

MR. MIRABEL:  Yeah, if you read the text that Mr. Wallace quotes in his motion, in fact, I don't say anything about threatening her not to show up.  There's a broad statement about a threat.  But then, the actual quote is "I better not show up or he wasn't going to give me half of his earnings from the case."  Quote/unquote.

That was true.  She was trying to get half my earnings from the case.  I said, "I can't do that."  I said, "If you come to court and lie, I won't pay you anything,

including the consultant fees that I was supposed to pay."

The other thing is that she says, specifically, "But he got mad at me for not coming to take a bath with him, so he did whatever he wanted to do with the amended complaints and everything else if I didn't cooperate." That was the strongest statement of sexual harassment that she makes in the quotes that Mr. Wallace quotes in his 68 motion.

But that's simply a matter -- no matter how you construe that, that's me exercising my independent judgment. Even if it was true, which it's not, but that was me exercising my influence -- my judgment not to be influenced by a client simply. That's the strongest thing she says.

And then in her partner's declaration from Mr. Allen, he says that -- he doesn't say that I'm requiring house fees from her. He says that I'm charging them to other plaintiffs. She says I charged them to other plaintiffs. That's as far as they go in their motion.

So, in addition, just let me continue, and I'd like to just explain the background of what happened.

On 11/22, November 22nd this year, we had a dinner, Ms. Nicholson and I. She set up a meeting with me, and we had a dinner. And she said, "Mr. Wallace had offered me a case -- to be a witness in a case for malpractice against me."

I said -- and she said, "I didn't take it up."

Then on November 25th, I received a letter from her

lawyer in Pasadena --

THE COURT:  Just a moment.  Mr. Mirabel.  We didn't get that.  Her lawyer?

MR. MIRABEL:  She has a lawyer -- she hired a lawyer in Pasadena who sent me a letter on November 25th and said, "I'm going to pursue mal practice against a bar complaint grievance against you for unprofessional activities and for malpractice."

His name is Mr. Lee Giddens, Albert Lee Giddens from Pasadena.  I got that on November 25th.  So I called him, and I said, "Why is she pursuing a case when she's got a supreme court case ongoing, pending?"  Which she does on her claim.  They're still in front of the supreme court.  She filed a brief pro se.

Let me know if you can't hear me okay.  Please interrupt me at any time.

So I told him that if she was going to be suing me, I wasn't going to be paying her any consulting fees as I had offered at one point.  That was the end of that conversation.

On November 27, I received a Bates-labeled video from Mr. Wallace as production in this case where I was naked from the waist up, citing a rap verse that I supplied to Ms. Nicholson years ago.  So the message to me was clear that she was telling me I've got embarrassing materials that I'm going to bring and show if you don't pay me my half -- my

consulting fees or half your fees, whatever I want.  And Mr. Wallace was cooperating with her in that, because the video has nothing to do with anything in this case of me rapping half naked.

So in any event, then on 12-2, I sent some more arguments and pleadings about malpractice to Mr. Giddens to try to convince him that he didn't have a malpractice case.

I got a message from her, that's Exhibit 70-17, showing she emailed several times, and she ended up saying Casey, Mr. Wallace, is letting my lawyer know what's really going on.

On November 6, they filed a protective order.

On December 6, pardon me, they filed a motion for protective order.  On December 6, Mr. Giddens wrote -- I wrote Mr. Giddens, and he wrote me back saying they were not necessarily convinced -- they were not pursuing a malpractice case.  Rather, he said, they're going to pursue a bar case first.  And he says don't talk to her.

THE COURT:  Mr. Mirabel, let me interrupt you, because I want you to direct my attention to what -- I want your response to be directed to something that was troubling.

Two things.  One, I'm looking at a alleged text message string which is attached or filed with the court as Document Number 69-1.  Mr. Wallace referenced this email string.  And it seems to be a pretty, for lack of a better

word, disgusting exchange between and you Ms. Nicholson that is now on file with a Federal District Court.

So in regards to this particular email exchange, obviously I'm not sure if you were representing her at the time, but this seems to be --

MR. MIRABEL:  No.

THE COURT:  -- a pretty extreme way of communicating with, if not your client, at least a witness in a case in which you are a lawyer.

MR. MIRABEL:  Your Honor, she already informed me that I was being sued for malpractice and she was pursuing a grievance against me.  And she asked me for comments in Document 725.  In Document 70-25, she asked me repeatedly for comments after she called me a female dog.  In 17, prior to that, she asked me for comments multiple times.  She said, "Let me know if you have anything to say."

So finally I asked her for that text, because it goes directly against her assertion that I was requiring keys. My text said, "Do you still have the texts on -- sexual acts, because that was directly opposing her claim of malpractice and improper conduct that I had used the case to get sex from her, which of course never happened.  That's why I was asking for that text, quite simply.

THE COURT:  Well, let me direct --

MR. MIRABEL:  It was directed, obviously, to --

THE COURT:  Mr. Mirabel --

MR. MIRABEL:  Yes, Your Honor.

THE COURT:  -- let me direct your attention to one other thing that Mr. Wallace said.  Mr. Wallace says -- said, that Ms. Nicholson recorded conversations with you where you state that she is not to appear as a witness in this case.

MR. MIRABEL:  Never happened.

THE COURT:  So let me just --

Let me be clear.  If that that tape is acquired by Mr. Wallace, and Mr. Wallace plays it for me, and I hear on that tape you talking to a witness in this case telling that witness not to appear, there are going to be consequences.  Do you understand?

MR. MIRABEL:  I understand, Your Honor.  That never happened.  There's no such tape.  And I have no problem, so I'm not worried.

THE COURT:  All right.  Just so -- and not only are you telling me there's no such tape, here on the record today you are denying that that ever took place.

MR. MIRABEL:  I never made a statement like that.  I said, "I will not pay you half the fees in the case if you show up to court and lie," as she was saying.  She said she was going to come to court and lie and say that I was a disgusting man that made her do stuff and stuff like that.  I said, no --

THE COURT:  Now, Mr. Mirabel, one other issue.

MR. MIRABEL:  Yes.

THE COURT:  Again, it's part of your filing with this court.  You filed as part of Document 70, Exhibit P, as in "Paul".  That's a pretty disgusting filing for a district court.  So I'm trying to get from you the necessity for putting something like that on file with the court.

MR. MIRABEL:  She's told you, Your Honor, that I was trying to get -- using the case to get sex from her with couching.  That shows that there wasn't couching.  She was offering me sex for money.

THE COURT:  Okay.

MR. MIRABEL:  I never attempted -- so I have to put that out there, Your Honor.  I don't see how I can avoid it.

THE COURT:  Okay.

MR. MIRABEL:  Can we turn to Miss Robinson, because I'd like to address that.

THE COURT:  Just a minute.  Let me be clear as to why I called this hearing and what I hope to accomplish by this hearing.  One, I was quite disturbed by the tenor of the allegations in this case.  I was disturbed by the exchange of emails that I saw.  I remain disturbed by the allegation that Mr. Wallace has made here in open court today regarding witness intimidation.

I can tell you, if it is determined by me -- this is

not going to be the last of my inquiry into this.  If it is determined by me that an officer of this court engaged in any witness intimidation or directed a witness not to comply with a subpoena or to comply with any other lawful order of this Court, there will be severe consequences.

I have heard you, Mr. Mirabel, as an officer of this court to deny the allegations that Mr. Wallace has put before this court.  But I can tell you, your own filings, your own emails are troubling.  They're not troubling to the extent that I am prepared to invoke severe consequences on you at this moment.  But I can tell you, again, if it is determined that you have engaged in witness intimidation or directed a witness not to comply with a subpoena, there will be consequences.

I assume at some point I will hear from Ms. Nicholson herself on this.

So with that being said, let me by way of offering up some relief by way of a protective order.  You are directed not to have any contact whatsoever with any witness in this case without prior approval of the Court.  Any communication you are to have with the witness is to take place in the form of a deposition in front of a court reporter such that there will be a record of any exchange that you have with a witness.

Am I clear?

MR. MIRABEL:  You are clear, Your Honor.

May I have -- yeah.  Can we keep discovery open so I can take Ms. Nicholson's deposition?

THE COURT:  Well, to the extent that you have been accused of intimidation with Ms. Nicholson, as to the merits of the case before me, what is your need to take her deposition in this case?

MR. MIRABEL:  She's been cooperating with Mr. Wallace to intimidate me by sending me videos; and he's been cooperating with her extensively in this case.  And I'd like to find out how deep that cooperation goes.  There's an email texting him that she said they offered to pay her to sabotage the case that I put to mine.  And that's certainly investigative as well.

THE COURT:  Before that deposition takes place, I'd like for Ms. Nicholson to come before this court and to give me some reason to allow that deposition to take place.  I'm not ruling it off the table.  But before it proceeds, I need to have a discussion, put eyes on Ms. Nicholson, to determine whether or not such a deposition is necessary.  Is that understood?

MR. MIRABEL:  Yes.

THE COURT:  Now, again, today is December the 20th.  It is 9:25.  From this moment on I expect no additional communication whatsoever with any witness in this case.  Am I clear?

MR. MIRABEL:  Yes, Your Honor.

THE COURT:  Okay.

And, again, if, on reflection, you would like to alter any of your representations to this Court, I would suggest that you do so sooner rather than later.  You remain a officer of this court.  I am taking you at your word regarding perhaps a different lens in which some of these communications have taken place.  But at some point in time I am going to hear from Ms. Nicholson and get a better sense as to what she believes occurred.

Most importantly, sir, again, back to what Mr. Wallace has alleged, he alleges that he was told by Ms. Nicholson that tapes exist of communications between you and her wherein you state that she is not to comply with the subpoena or to cooperate.  You have told me that no such communications have taken place, and you are not concerned if such a tape could be produced because it did not happen.

So, again, I'll await to see if Mr. Wallace is able to obtain those tapes.  But if he is, there will be consequences not only for the representations on that tape but representations that you've made to this Court today.  Understood?

MR. MIRABEL:  Yes, Your Honor.

And before we go, though, Your Honor, can I explain the rest of the intimidation which together that Mr. Wallace

in his letter of October 14th to enlighten you to the background on that, if you don't mind.

THE COURT:  Okay.  You faded out.

All right.  So that takes care of the matter that the Court was concerned about and wanted to see the lawyers about today.  I will be issuing a order on some of the pending motions.  That order is on my desk.  And I hope to get to it within the next -- before the end of the year or shortly after the beginning of the year.

With that being said, Mr. Wallace, anything else, sir?

MR. WALLACE:  No, Your Honor.

THE COURT:  Mr. Mirabel, anything else, sir?

MR. MIRABEL:  Yes, Your Honor.  I'd like to explain Mr. Wallace's October 14th letter where he claims I intimidated witnesses, including Alicia Robinson and others, that won't testify any longer.  I'd like to explain the background for that.

THE COURT:  It's not necessary.  I've dealt with the issues that I brought you in for today.

MR. MIRABEL:  Okay.

THE COURT:  All right.  Counsel, we're adjourned.  You're excused.

MR. WALLACE:  Thank you, Your Honor.

MR. MIRABEL:  Thank you.

MR. BARNES:   Thank you, Your Honor.

(Proceedings concluded at 9:29 a.m.)

Donna Prather, RMR, CRR, CCP, CBC
Official Court Reporter for the United States District Court – Southern District of Texas
(713) 250-5221

**REPORTER'S CERTIFICATE**

I, DONNA J. PRATHER, do hereby certify that the above and foregoing, consisting of the preceding 20 pages, constitutes a true and accurate transcript of my stenographic notes and is a full, true, and complete transcript of the proceedings to the best of my ability.

Dated this 17th day of April, 2025.

DONNA J. PRATHER, RMR, CRR, CCP, CBC
Federal Official Court Reporter